**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MATTHEW JOHN MATAGRANO[1],

                        Plaintiff,                    9:19-CV-00763 (BKS/DJS)

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION,
CENTRAL NEW YORK PSYCHATRIC CENTER, NEW
YORK STATE OFFICE OF MENTAL HEALTH,
JACQUELINE LEVITT[2], MD, and STEWART T.
ECKERT,

                        Defendants.

---

**Appearances:**

*For Plaintiff:*
Amy Jane Agnew
Law Office of Amy Jane Agnew, P.C.
24 Fifth Avenue
Suite 1701
New York, NY 10011

*For Defendants:*
Letitia James
Attorney General of the State of New York
Denise P. Buckley
Assistant Attorney General
The Capitol
Albany, New York 12224

---

[1] While the caption on Plaintiff's Second Amended Complaint uses the spelling "Mattagrano," (Dkt. No. 31-2, at 1), this Court uses the spelling "Matagrano," which is consistent with the spelling used in Plaintiff's pro se original and first amended complaints, and Plaintiff's most recent submissions. (Dkt. No. 1, at 1; Dkt. No. 9, at 1; Dkt. Nos. 30, 42). The Clerk is respectfully requested to change the docket accordingly.

[2] While the caption on Plaintiff's Second Amended Complaint uses the spelling "Leavitt," (Dkt. No. 31-2, at 1), Plaintiff's counsel since confirmed that this was an error, and that "Levitt" is the proper spelling, (Dkt. No. 41, at ¶ 33). The Clerk is respectfully requested to change the docket accordingly.

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Matthew John Matagrano commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), Title II of the Americans With Disabilities Act, 42 U.S.C .§ 12101, et seq. ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. ("Rehabilitation Act") on June 27, 2019, by filing a pro se civil rights complaint (the "Original Complaint"), (Dkt. No. 1), together with an application for leave to proceed in forma pauperis (the "IFP Application"), (Dkt. No. 2). By Decision and Order filed August 5, 2019, this Court granted Plaintiff's IFP Application and, following review of the Original Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), dismissed some of Plaintiff's claims and some of the named Defendants, and directed service and a response for the claims that survived sua sponte review. (Dkt. No. 4).

On September 25, 2019, Plaintiff filed a pro se amended complaint (the "First Amended Complaint" or "FAC"). (Dkt. No. 9). Following review of the FAC pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), the Court found that the following claims survived sua sponte review and required a response: (1) Plaintiff's ADA and Rehabilitation Act claims against Defendants New York State Department of Corrections and Community Supervision ("DOCCS"), Central New York Psychiatric Center ("CNYPC"), and New York State Office of Mental Health ("OMH"); (2) Plaintiff's First Amendment retaliation claims against individual Defendants Stewart T. Eckert, Betty Jo Gabel, Elena Marrone, Jaqueline Levitt, and Brigid McDonald; and (3) Plaintiff's Eighth Amendment medical indifference claims against individual Defendants Margaret Stirk, Eckert, Gabel, Marrone, Levitt, and McDonald. (Dkt. No. 16). On March 5, 2020, Plaintiff, now represented by counsel, filed a motion, (Dkt. Nos. 30-32), for

2

leave to file a second amended complaint (the "SAC"), (Dkt. No. 31-2), which "endeavored to clarify Plaintiff's allegations and causes of action for the Court and parties" and added "a few supplemental allegations to the very end of the complaint" describing events that occurred in October 2019, after the FAC was filed. (Dkt. No. 31, at ¶¶ 4, 6).[3]

Presently before the Court are Plaintiff's motion to amend his complaint, (Dkt. Nos. 30-32), and Defendants' motion: (1) "pursuant to Federal Rule of Civil Procedure 56(a) for an order granting defendants Stewart T. Eckert and Jacqueline Levitt . . . summary judgment dismissing [P]laintiff's claims against them in their entirety based on [P]laintiff's failure to exhaust his administrative remedies"; (2) "pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) for an order dismissing [P]laintiff's claims pursuant to [the ADA] against defendants DOCCS, CNYPC, and OMH in their entirety as [P]laintiff has not stated a claim pursuant to the ADA upon which relief may be granted sufficient to overcome the Eleventh Amendment's statutory bar"; and (3) "pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing the remainder of the claims in the First Amended Complaint and proposed Second Amended Complaint in their entirety based on [P]laintiff's failure to state a claim upon which relief may be granted," (Dkt. No. 39, at 1-2). Plaintiff has responded to Defendants' motion, (Dkt. Nos. 40-42), and Defendants have submitted a reply, (Dkt. No. 47).

On June 2, 2020, while Plaintiff's motion to amend his complaint and Defendants' motion to dismiss were still pending, the Court granted Plaintiff's request for voluntary dismissal without prejudice of all claims against individual Defendants Stirk, Gabel, McDonald and Marrone pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). (Dkt. No. 44). Therefore, Plaintiff's

---

[3] Plaintiff subsequently filed a redlined version of the SAC containing additional, non-substantive typographical edits, including corrections to the spelling of Defendant Levitt's name. (Dkt. No. 41-27).

remaining claims, all of which Defendants seek to dismiss, are: (1) Plaintiff's Eighth

Amendment deliberate medical indifference claim against Defendants Eckert and Levitt in their

individual capacities, and (2) Plaintiff's ADA and Rehabilitation Act claims against Defendants

DOCCS, OMH and CNYPC. (Dkt. No. 31-2, at 30-35). On these claims, Plaintiff seeks

compensatory damages, attorneys' fees and costs from all Defendants, as well as punitive

damages from Defendants Eckert and Levitt, and does not seek injunctive relief. (*Id.* at 35).[4]

For the reasons set forth below, Plaintiff's motion to amend is granted and Defendants'

motion for summary judgment and dismissal is granted in part.

## II.    FACTS[5]

### A.    Facts Relevant to Plaintiff's Eighth Amendment Claim[6]

Plaintiff is an inmate in the custody of DOCCS, who was incarcerated at Wende

Correctional Facility ("Wende") during the events relevant to his claims.[7] (Dkt. No. 40, at ¶ 1).

Plaintiff "suffers from a severe and chronic mental illness, that without psychiatric care limits his

functionality" and "has been under psychiatric care and has been prescribed various psychotropic

medication(s) [sic] since December of 1986." (*Id.* ¶¶ 34-35). As a result of his illness, Plaintiff

"has an approximate[ly] thirty-one year history of self-mutilation and suicide attempts." (*Id.* ¶

37). Plaintiff has received treatment for his mental illness while in DOCCS custody, and

---

[4] The Court has not considered Plaintiff's First Amendment retaliation claim against Defendants Eckert and Levitt because the Plaintiff has not included those claims in his proposed Second Amended Complaint. (Dkt. No. 41-27, at 30).

[5] For purposes of this decision, the Court discusses only the facts that are directly relevant to the motions that are presently before it, and not facts that relate to claims that have been voluntarily dismissed.

[6] These facts are relevant to Defendants Eckert and Levitt's motion for partial summary judgment and are drawn from Defendants' Statement of Undisputed Material Facts pursuant to Local Rule 7.1(a)(3), (Dkt. No. 39-2), and Plaintiff's response to Defendants' Statement of Undisputed Material Facts, (Dkt. No. 40), together with the evidence attached thereto and cited therein, (Dkt. Nos. 39-1, 41). The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[7] Plaintiff was recently transferred to Sullivan Correctional Facility in Fallsburg, New York to be treated in the Intermediate Care Program, a residential mental health program for severely mentally ill patients that is jointly operated by DOCCS and OMH. (Dkt. No. 41-27, at ¶¶ 4, 39-40).

therefore, Defendants DOCCS, CNYPC, OMH and Levitt all "had personal knowledge of Plaintiff's extensive and documented psychiatric history." (*Id.* ¶ 36).

On three occasions prior to September 2017, Wende security staff confiscated Plaintiff's DOCCS-issued shaving razor, then returned it within a few days. (*Id.* ¶ 39). On September 17, 2017, Plaintiff cut himself with the shaving razor, resulting in an extreme amount of blood loss and loss of consciousness. (*Id.* ¶ 38). Following that incident, Plaintiff's shaving razor was confiscated, and from September 18, 2017 to June 23, 2019, Plaintiff did not have a DOCCS-issued razor in his possession. (*Id.* at ¶ 44). Then, on June 23, 2019, security staff at Wende attempted to force Plaintiff to accept a razor, citing a DOCCS policy that "all inmates housed in general population must have a razor, without exception." (*Id.* ¶¶ 43, 46). When Plaintiff attempted to refuse the razor, citing the significant risk the razor posed to his health and safety, he was placed in the Residential Crisis Treatment Program ("RCTP") for observation, despite the fact that at the time, he was not suicidal, homicidal, suffering from hallucinations or posing a threat to himself or others. (*Id.* ¶¶ 45, 47). Plaintiff was discharged from the RCTP the following day. (*Id.* ¶ 48).

On June 24, 2019[8] Plaintiff filed a grievance (the "Razor Grievance") with Wende's Inmate Grievance Resolution Committee ("IGRC"), seeking an exemption from Wende's mandatory razor policy and explaining that possessing a razor posed a significant risk of harm to his health and safety. (*Id.* ¶ 14; Dkt. No. 41-24, at 1). IGRC held a hearing on Plaintiff's grievance on July 16, and on July 23, IGRC sent Plaintiff a written decision denying the grievance and citing Wende's policy requiring inmates to possess state-issued razors. (Dkt. No.

---

[8] Records maintained by DOCCS' Central Office Review Committee ("CORC") reflect that the grievance was filed with IGRC on June 4, 2019. (Dkt. No. 39-1, at 12). However, the grievance itself is dated June 24, 2019, (Dkt. No. 41-24, at 1), which is more consistent with Plaintiff's allegation that the incident forming the basis of the grievance occurred on June 23.

40, at ¶¶ 52, 55; Dkt. No. 41-24, at 2). Plaintiff appealed IGRC's denial to Defendant Eckert, the Superintendent at Wende, who denied the appeal via written decision on July 30, again citing Wende's mandatory razor policy. (Dkt. No. 40, at ¶¶ 56-57; Dkt. No. 41-24, at 3). That same day, Plaintiff appealed the Superintendent's decision to CORC, whose records reflect that they received the appeal on August 13, 2019. (Dkt. No. 40, at ¶¶ 14, 58, 61; Dkt. No. 41-24, at 3; Dkt. No. 39-1, at 12). As of April 7, 2020, CORC still had not issued a decision on Plaintiff's appeal. (Dkt. No. 40, at ¶ 15; Dkt. No. 39-1, at 12).[9] During this period, Plaintiff also advocated for an exemption to the mandatory razor policy by writing letters to CNYPC officials, verbally discussing the policy with a DOCCS Captain, and having a representative from the Legal Aid Society write letters to DOCCS officials, including Defendant Eckert, on his behalf. (Dkt. No. 40, at ¶¶ 50-51, 53-54).

On August 2, 2019 during an examination by Defendant Levitt, Wende's Facility Health Services Director and Plaintiff's primary care provider, Plaintiff told Levitt that he did not want to possess a razor because his impulses to use it to self-harm during periods of high stress were uncontrollable. (*Id.* ¶ 59). Dr. Levitt told Plaintiff to raise his concerns about the razor to Wende's mental health unit, but otherwise took no action with respect to the razor policy. (*Id.* ¶ 60).[10]

Plaintiff's Original Complaint, filed on June 27, 2019—only three days after the date on his Razor Grievance—did not include an Eighth Amendment claim based on Defendants' failure to create an exception to Wende's mandatory razor policy. (Dkt. No. 1; Dkt. No. 40, at ¶ 33). In

---

[9] The record does not reflect whether CORC has issued a decision on Plaintiff's appeal since April 7, 2020.

[10] While not referenced in his response to Defendants' Statement of Undisputed Facts, Plaintiff's unverified SAC alleges that on October 13, 2019, during a mental health crisis, Plaintiff used his DOCCS-issued razor to cut his arms and attempt to take his own life, resulting in blood loss, lacerations, physical pain and emotional turmoil. (Dkt. No. 41-27, at ¶ 241-42).

his FAC, filed on September 25, 2019—more than 30 days after August 13, the date CORC received his appeal of the Razor Grievance—Plaintiff added allegations and claims related to the razor policy. (Dkt. No. 9; Dkt. No. 40, at ¶¶ 62-63). The SAC includes an Eighth Amendment deliberate indifference claim against Defendants Eckert and Levitt, alleging that they had personal knowledge of Plaintiff's mental illness and history of suicide attempts, that Plaintiff raised to both Defendants his concerns that forcing him to possess a state-issued razor endangered him, and that both Defendants' refusal to intervene and create an exception to the razor policy constituted deliberate indifference to Plaintiff's medical needs. (Dkt. No. 41-27, at ¶¶ 250-61).

### B.      Facts Relevant to Plaintiff's ADA and Rehabilitation Act Claims[11]

#### 1.      Plaintiff's Disability

In addition to his mental illness, Plaintiff suffers from a hearing disability stemming from trauma as a young child. (Dkt. No. 41-27, at ¶ 5). An audiology assessment conducted in September 2013, shortly after Plaintiff entered DOCCS' custody, determined that his hearing capacity was HL 20, meaning he demonstrated "significant hearing impairment." (*Id.* ¶¶ 6, 30). The audiologist recommended that Plaintiff be accommodated with an amplifier, a Teletype device ("TTY"), a phone amplifier, bilateral hearing aids and other accommodating devices based on his individualized assessment of Plaintiff's hearing and functional capabilities. (*Id.* ¶ 38). Subsequently, Plaintiff's most recent assessment in July 2019 determined that his hearing capacity had deteriorated to HL 10, meaning he demonstrated "severe, profound hearing loss." (*Id.* ¶¶ 7, 30, 127-29). In perfect conditions, including small rooms without any ambient noise,

---

[11] The facts set forth in this section are drawn from the SAC. The Court cites to the most recent version of the SAC, (Dkt. No. 41-27), which, aside from minor typographical revisions, is substantively identical to the version attached to Plaintiff's motion to amend, (Dkt. No. 31-2). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

Plaintiff can lip read and hear subtly when he is wearing hearing aids that are both in place and operational. (*Id.* ¶ 32). However, when he is in a room with other voices or surrounding sounds, or when he is not wearing hearing aids, Plaintiff is unable to hear well enough to distinguish voices and words. (*Id.* ¶ 33).

Plaintiff wears hearing aids in both ears and relies on a suite of accommodating devices to understand and communicate, including a TTY, a T-COIL induction loop, a telephone amplifier, closed caption television, sound amplification systems, a visual smoke detector, preferred seating, a shake awake alarm, a pocket talker, and the use of American Sign Language ("ASL") to communicate. (*Id.* ¶ 8). DOCCS, CNYPC, OMH and their employees have been aware of Plaintiff's hearing disability throughout his incarceration. (*Id.* ¶ 9).

### 2.  Alleged Discrimination by DOCCS

#### a.  DOCCS' "Call Home" Program

DOCCS allows inmates to take advantage of a "Call Home" program, which allows each inmate a list of up to fifteen people they can call using phones in the facilities, subject only to disciplinary sanctions or other security-related restrictions. (Dkt. No. 41-27, at ¶ 41). The purpose of the program is to encourage contact between the inmate and friends and family at home. (*Id.*). Because using a normal telephone is "almost impossible" for Plaintiff due to his hearing disability, he is only able to take advantage of the Call Home program by using a TTY, a device "whereon he types words and an operator 'reads' them aloud to the person on the other line," and "[t]he operator then types the words the other person says back to [Plaintiff] and the words appear in typed form for him to read." (*Id.* ¶¶ 34, 42).

Wende possesses five TTY devices: one in D-23 Company, a housing unit in the facility for sensorially disabled inmates; one in D-Block yard, where the sensorially disabled prisoners have recreation time; one in the Gym; one in the Ballfield; and one in the Honor Block. (*Id.* ¶

43). Inmates do not have independent access to the TTYs; rather, because all the TTYs are kept in locked cabinets for their protection, a hearing-impaired inmate must ask a corrections officer to unlock a TTY in order to use it. (*Id.* ¶ 44).

In July 2015 and November 2015, class counsel for *Clarkson v. Coughlin*[12] wrote to DOCCCS' general counsel's office advising that the TTY devices at Wende were inoperable, preventing hearing-impaired inmates like Plaintiff from utilizing the Call Home program, but no response was received. (*Id.* ¶¶ 45-48). On December 22, 2015, Plaintiff himself wrote to DOCCS' ADA Coordinator complaining that Wende's TTY devices were broken, but received no response. (*Id.* ¶¶ 53-54).

On June 6, 2016, Plaintiff's right to use the TTYs was revoked, rendering him unable to participate in the Call Home program. (*Id.* ¶ 56). Two days later, Plaintiff filed a grievance challenging this revocation, which was denied, submitted an appeal to the Superintendent, which was also denied, and ultimately appealed to CORC. (*Id.* ¶¶ 61, 65). In addition to the grievance process, Plaintiff engaged in other efforts to restore his access to the TTYs, including writing a letter to Wende's Nurse Administrator, (*Id.* ¶ 57), submitting multiple new reasonable accommodation requests, (*id.* ¶¶ 62-64, 69), meeting with a Sensorial Disabled Unit employee, (*id.* ¶ 66), obtaining another audiogram which confirmed his hearing ability as HL 20, (*id.* ¶ 67), and filing a complaint with the U.S. Department of Justice's Office of Civil Rights, (*id.* ¶ 68). Finally, on September 9, 2016, Plaintiff's permission to use the TTYs was reinstated. (*Id.* ¶ 70). Subsequently, CORC issued a decision upholding the Superintendent's decision on Plaintiff's grievance and stating that "the grievant has been approved to use the TTY since 8/31/16." (*Id.*). Plaintiff alleges that, as a result of DOCCS' revocation of his TTY access, he was unable to use

---

[12] *Clarkson v. Coughlin*, 91-cv-1792 (S.D.N.Y.) is a "long-resolved class action addressing reasonable accommodations for DOCCS hearing impaired and deaf patients." (*Id.* ¶ 45).

the TTYs to take advantage of the Call Home program from June 6, 2016 through August 31, 2016. (*Id.* ¶ 71).

On February 13, 2018, upon his return from an inpatient stay at CNYPC, Plaintiff was once again approved for use of TTYs, along with other reasonable accommodations. (*Id.* ¶ 86). On April 20, 2018, Plaintiff wrote to Wende's Deputy Superintendent of Programs informing her that the TTY devices in the D-block housing area and yard were once again not working. (*Id.* ¶ 87). On April 23, 2018, Plaintiff received a response stating that "the TTY is currently working"; however, in fact, the TTYs were not repaired until April 25, 2018. (*Id.* ¶ 88). During this period, Plaintiff was denied access to other operable TTYs in the facility, while inmates without hearing disabilities could make calls during any recreation or free time. (*Id.*).

Even during periods when the TTYs were operational, Plaintiff's access to them was sometimes prevented by security personnel who refused to unlock the box upon his request during hours where they were supposed to available. (*Id.* ¶¶ 89-97). On June 13, 2018 and again on July 5, 2018, Plaintiff filed grievances citing specific instances in which this occurred, both of which were denied by the IGRC, appealed to the Superintendent and then to CORC, and ultimately denied on appeal, with those denials relying on allegedly false statements by correctional officers claiming that Plaintiff had not, in fact, been denied access. (*Id.* ¶¶ 91-97).

On August 20, 2018, Plaintiff was told by a correctional officer that his name had been crossed off the list of inmates approved to use TTYs, and that he therefore could no longer use them. (*Id.* ¶ 101). Based in part on a memo written to another inmate, Plaintiff alleges that Wende's Deputy Superintendent of Mental Health was arbitrarily and improperly basing TTY access approvals on "nothing more than audiology results," without conducting an individualized assessment of each inmate's needs, and had revoked Plaintiff's access solely based on his HL20

designation. (*Id.* ¶¶ 99-100, 112). On August 21, the same officer advised Plaintiff that he spoke

with Elena Marrone, a translator at Wende responsible for working with disabled inmates, and

she confirmed that Plaintiff was not authorized to use the TTY. (*Id.* ¶ 102). However, when

Plaintiff spoke with Marrone that same day, she told him, allegedly falsely, that she had not

revoked Plaintiff's access to the TTY, and suggested that only the medical department would

have the authority to revoke his access. (*Id.* ¶¶ 103-04). Later that day, Plaintiff received a letter

stating that "a new approval sheet has been given to D Block with your name on it," but the

following day, Plaintiff received a letter stating, "TTY accommodation approval or denial is

pending the results of your upcoming medical appointment." (*Id.* ¶¶ 105-06). Plaintiff filed a

grievance challenging the revocation of his TTY accommodation, and on September 12, IGRC

issued a response stating, allegedly falsely, that Plaintiff had been reevaluated regarding his

hearing loss and found not eligible for the TTY. (*Id.* ¶¶ 108-12). Plaintiff appealed the IGRC

response, his appeal was denied, and he appealed to CORC. (*Id.* ¶¶ 113-14). Finally, after the

*Clarkson* class counsel wrote a letter to DOCCS' *Clarkson* ombudsperson on his behalf, Plaintiff

was informed on October 29, 2018 that his access to the TTYs had been reinstated. (*Id.* ¶¶ 115-

18). At that point, Plaintiff had been denied access to the TTYs for over two months. (*Id.* ¶ 119).

In May and June 2019, Plaintiff submitted further letters and yet another grievance

complaining that the TTY devices in D-Block yard and the ball field were broken. (*Id.* ¶¶ 120-

23). He received a response from IGRC on June 7, 2019 saying that the "TTY in the ball field

has a problem with the wiring and maintenance has been made aware via work order." (*Id.* ¶

124). At that time, "[n]o effort had been made to fix the TTY in ball field since August 2018,"

and the IGRC's response did not address the broken TTY in D-Block yard. (*Id.* ¶ 125). Plaintiff

appealed to Eckert. (*Id.* ¶ 126).

### b.    Ban on ASL in the Mess Hall

On or around November 20, 2015, Plaintiff was advised by a correctional officer at
Wende that he was not allowed to use ASL to communicate in the mess hall. (Dkt. No. 41-27, at
¶ 49). Plaintiff claims that this ban on using ASL in the mess hall discriminates against hearing-
impaired inmates, since inmates without hearing disabilities are allowed to communicate in any
language when in the mess hall. (*Id.* ¶ 50). Plaintiff filed a grievance and proceeded through the
three-step grievance process mandated by DOCCS, until CORC ultimately issued a final
decision denying his grievance on February 3, 2016. (*Id.* ¶¶ 49, 51). Plaintiff alleges that this
"violation [of the ADA and Rehabilitation Act] was on-going thereafter as at no time were
[Plaintiff] and his hearing-impaired and deaf cohort allowed to communicate with ASL in the
mess hall of Wende without risk of receiving a disciplinary ticket." (*Id.* ¶ 52).

### c.    Lack of Access to the "Resource Room"

Plaintiff also faced difficulties accessing Wende's "resource room" for hearing-impaired
inmates, which contained T-Coils, pocket talkers and other aids and devices designed to
accommodate such inmates. (Dkt. No. 41-27, at ¶ 171). On April 21, 2017, Plaintiff attended an
Inmate Liaison Committee meeting, where he informed DOCCS officials, including Defendant
Eckert, that inmates with hearing disabilities were unable to access the resource room because it
was under lock and key and there was no staff coverage to facilitate access. (*Id.* at ¶¶ 75, 77). In
response to his concerns, Plaintiff received a letter from DOCCS' general counsel's office
advising him that, "according to facility staff, deaf/hard of hearing inmate[s]" were being
"accommodated" by a Wende employee, but in fact, no such access to the resource room was
provided. (*Id.* ¶¶ 78-79). On May 16, 2017, class counsel for the *Clarkson* case wrote DOCCS'
general counsel's office raising concerns about hearing-impaired inmates' lack of access to the
resource room, but Wende staff continued to argue that "they did not have the staff coverage and

security staff did not have the keys to the resource room to provide access to hard of hearing/deaf inmates." (*Id.* ¶¶ 75-76). On July 26, 2017, Plaintiff received a memorandum stating that, from July 2017 onward, access to the Resource Room would be by "call out" only, a process which "generally takes days to request and be granted." (*Id.* ¶¶ 80-81).

On July 27, 2017, Plaintiff filed a grievance regarding his inability to access the resource room to obtain replacement batteries for his hearing aids and access to other auxiliary aids, which was denied by IGRC with the explanation that there was a shortage of staff in Wende's Sensorial Disability Program unit. (*Id.* ¶¶ 82-83). Plaintiff appealed the grievance to the Superintendent, and then to CORC.[13] (*Id.* ¶ 84). On July 6, 2018, Plaintiff filed another grievance alleging that the resource room was closed from June 25, 2018 to June 29, 2018 and July 2, 2018 to July 6, 2018, denying Plaintiff access to accommodations like a T-Coil, Pocket talker and other aids and devices. (*Id.* ¶ 171). Plaintiff alleges that, despite limited staffing, visually impaired inmates were being given full access to their resource room, while hearing impaired inmates were not. (*Id.* ¶ 173). Both the IGRC and the Superintendent denied the appeal, and Plaintiff appealed to CORC.[14] (*Id.* ¶ 172).

### d.      Failure to Provide Replacement Hearing Aid Batteries

Plaintiff also alleges several incidents in which DOCCS failed to timely provide him with replacement batteries for his hearing aids. On June 6 and June 7, 2019, Plaintiff requested "sick call" to obtain replacement batteries, but no one came to take him to sick call. (Dkt. No. 41-27, at ¶ 141). Plaintiff could not request sick call on June 8 and 9, as those dates fell on a weekend; however, on June 8, Plaintiff sent a letter to Wende's Deputy Superintendent of Health informing

---

[13] CORC's records reflect that CORC did not issue a decision on Plaintiff's appeal until January 8, 2020. (Dkt. No. 39-1, at 10).
[14] CORC's records reflect that CORC issued a decision on Plaintiff's appeal over a year later, in October 2019. (Dkt. No. 39-1, at 10; Dkt. No. 41-20, at 5).

her of his failed attempts to obtain replacement batteries. (*Id.* ¶¶ 141-42). Plaintiff continued to

request sick call on June 10 and 11, to no avail. (*Id.* ¶ 147). At a scheduled appointment with

Defendant Levitt on June 10, Plaintiff informed her that he had been without batteries for five

days and requested replacements, but Levitt did not give him replacements, and instead told him

to make a request through the sick call process. (*Id.* ¶¶ 143-45). On June 10, Plaintiff filed a

formal grievance. (*Id.* ¶ 146). On June 11, Plaintiff wrote to Defendant Eckert and also

complained to prison officials that he saw in person, who advised him to write to Wende's

Health Services department. (*Id.* ¶¶ 147-49). Plaintiff was never taken to sick call for

replacement batteries, but on June 12, Plaintiff was finally given replacement batteries by a

correctional officer in D-Block. (*Id.* ¶ 152). The next day, Plaintiff received a response from

IGRC stating incorrectly that "grievant was seen at sick call on 6/11/19 and given replacement

batteries"; Plaintiff appealed to the Superintendent and then to CORC complaining of his

difficulties obtaining replacement batteries through the ordinary sick call process. (*Id.* ¶¶ 150-51,

153). By the time he obtained replacement batteries, Plaintiff had been without batteries or the

ability to hear for six days. (*Id.* ¶ 152).

On August 3, 2019, Plaintiff's hearing aids were confiscated at the direction of Defendant

Levitt, in connection with his transfer to the RCTP for treatment for a short-term mental health

crisis. (*Id.* ¶¶ 154-55). On August 5, Plaintiff was released from the RCTP, but his hearing aids

were not returned to him. (*Id.* ¶¶ 156-57). On August 9, Plaintiff attempted to retrieve his hearing

aids through the sick call program, but no one in the medical department could find Plaintiff's

hearing aids. (*Id.* ¶¶ 158-59). Plaintiff wrote letters to Defendant Levitt on August 9 and to

Defendant Eckert on August 14 requesting assistance finding his hearing aids, but received no

response to either letter. (*Id.* ¶¶ 160-62). On August 16, Plaintiff filed a grievance requesting that

the hearing aids be immediately returned or that he be immediately scheduled to receive new hearing aids. (*Id.* ¶ 163). On August 19, Plaintiff informed Levitt in person that he did not have his hearing aids, but she "did nothing." (*Id.* ¶ 164). On August 30, 2019, IGRC responded to Plaintiff's grievance, stating that the hearing aids and batteries had been found and would be provided to Plaintiff at that day's sick call. (*Id.* ¶ 165). However, Plaintiff did not see anyone in the medical department until September 3, when Defendant Levitt returned his rubber hearing aid molds and batteries, but not the actual hearing aids. (*Id.* ¶ 166). As his actual hearing aids were still missing, Plaintiff appealed IGRC's response to his grievance to Defendant Eckert and then to CORC. (*Id.* ¶ 169). By the time Defendant Levitt submitted a request for Plaintiff to be seen at the audiology clinic and receive new hearing aids, he had been without hearing aids and unable to hear for over a month. (*Id.* ¶¶ 167-68).

### e. Denial of Reasonable Accommodations for Program Committee Call-Out

On September 5, 2019 Plaintiff wrote to Marrone advising her that he had not been added to call out for the Resource Room, that he needed a Hard of Hearing sign for over his cell, and that the TTY device in D-Block yard was malfunctioning. (Dkt. No. 41-27, at ¶ 132). On September 10, Plaintiff saw Marrone in person, inquired as to the status of his requests, told her he did not have his bilateral hearing aids, and informed her that he would need a pocket talker for his mandatory Program Committee call-out. (*Id.* ¶¶ 133-34). Despite his request, no Pocket Talker was provided to Plaintiff, and no response was ever received to his September 5 letter. (*Id.* ¶ 135-36). As a result, Plaintiff could not attend his mandatory Program Committee call-out to participate in the selection of his programming, resulting in him being placed in a program by default. (*Id.* ¶ 135). The Complaint does not allege whether Plaintiff ever filed a grievance with respect to these incidents.

15

### 3.    Alleged Discrimination by OMH and CNYPC

CNYPC is a facility that provides mental health services to people incarcerated in the New York State and County Correctional Systems, including DOCCS. (Dkt. No. 41-27, at ¶ 21). CNYPC is operated by OMH, the New York state agency responsible for providing all mental health services and programming for people incarcerated in DOCCS facilities. (*Id.* ¶ 20). Both CNYPC and OMH receive federal and state funding to support their programs and services. (*Id.* ¶¶ 20-21).

Between October 5, 2017 and January 31, 2018, Plaintiff was hospitalized at CNYPC following his September 17, 2017 attempt to commit suicide with a DOCCS-issued razor. (*Id.* ¶¶ 176-83, 185).[15] Upon arrival at CNYPC, Plaintiff informed CNYPC staff of his hearing disability and requested accommodations, including TTY usage for phone calls, a phone amplifier, closed-captioned programming for video and a sound amplifier. (*Id.* ¶¶ 184, 186). CNYPC also had access to Plaintiff's medical records from DOCCS, which included his audiogram results and records of the accommodations DOCCS had approved for him. (*Id.* ¶ 189). CNYPC provided Plaintiff with replacement batteries for his hearing aids, but did not provide him with any of the other accommodations he had requested. (*Id.* ¶ 187).

As a result, during his entire period of hospitalization at CNYPC, Plaintiff could not meaningfully participate in "Treatment Mall" activities (group therapy) or therapeutic programming exercises that other patients without hearing disabilities could participate in. (*Id.* ¶ 191). He also could not understand the videos shown during therapeutic programming sessions, since they did not have closed captioning and he did not have the necessary equipment (such as a pocket talker or a sound amplification system) that would have allowed him to watch the videos

---

[15] Plaintiff alleges that, during his stay in Wende's RCTP between September 18, 2017 and October 5, 2017 prior to his transfer to CNYPC, DOCCS staff denied him access to his hearing aids. (*Id.* ¶ 180).

without closed captioning. (*Id.*). Plaintiff claims that the failure of OMH and CNYPC to provide

him with reasonable accommodations for his hearing disability, and his resulting exclusion from

the therapeutic programming offered by CNYPC and OMH, violated the ADA and the

Rehabilitation Act. (*Id.* ¶¶ 269-76).

## III.    MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.    Standard of Review

Defendants move for summary judgment, pursuant to Fed. R. Civ. P. 56(a), on Plaintiff's

Eighth Amendment claim against Defendants Eckert and Levitt on the ground that Plaintiff has

failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act

("PLRA"). Under Rule 56(a), summary judgment may be granted only if all the submissions

taken together "show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving

party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."

*Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the

governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of

New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this

burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway

Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving

party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict

in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## B.     Legal Standard for Exhaustion of Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

To properly exhaust his administrative remedies, an inmate must complete the administrative review process in accord with the applicable state procedural rules.[16] *Jones v. Bock*, 549 U.S. 199, 218-19 (2007). The PLRA contains one "textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). "Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Second Circuit has explained that "an administrative remedy may be unavailable when": (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123-24 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859-60).

Because "[f]ailure to exhaust administrative remedies is an affirmative defense," it is "not a pleading requirement." *Id.* at 122. Thus, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Id.* (quoting *Jones*, 549 U.S. at 216). "However, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Id.*

---

[16] "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). The grievance procedure in New York is a three-tiered process. The prisoner must first file a grievance with the IGRC. *See* 7 N.Y.C.R.R. § 701.5(a)(1), (b). An adverse decision of the IGRC may be appealed to the superintendent of the facility. *Id.* § 701.5(c). Adverse decisions at the superintendent's level may be appealed to CORC. *Id.* § 701.5(d).

C.      Discussion

Defendants argue that Plaintiff's Eighth Amendment claim against Defendants Eckert and Levitt concerning the razor policy must be dismissed because, at the time he filed his Original Complaint on June 27, 2019, he had not completed the three-step grievance process mandated by DOCCS with respect to this claim. (Dkt. No. 39-3, at 12-15). Plaintiff contends that, because he asserted this claim for the first time in his FAC filed in September 2019, the Court should examine whether his remedies were exhausted as of *that* complaint's filing, not as of the Original Complaint's filing. (Dkt. No. 42, at 18-19). Plaintiff further contends that, at the time he filed his FAC, CORC's mandatory 30-day timeline for issuing a decision on his appeal had passed, rendering the process "unavailable" to him and permitting him to file suit. (*Id.* at 19-23).

As an initial matter, Plaintiff's argument that the Court should look to the date of the FAC, rather than the Original Complaint, in evaluating the exhaustion question is unavailing. Plaintiff relies on a body of case law suggesting that the "PLRA does not bar a prisoner's motion for leave to supplement his pleading, pursuant to Rule 15(d), to set out any transaction, occurrence, or event that happens after the date of the pleading to be supplemented, as long as the prisoner has exhausted his administrative remedies related to that transaction, occurrence, or event, properly, prior to making such a motion." *Tolliver v. Malin*, No. 12-cv-971, 2014 WL 1378447, at *9, 2014 U.S. Dist. LEXIS 47970, at *23 (S.D.N.Y. April 4, 2014); *see also Anderson v. Spizziota*, No. 11-cv-5663, 2016 WL 11480707, at *29 n.21, 2016 U.S. Dist. LEXIS 18600, at *100 n.21 (E.D.N.Y. Feb. 12, 2016) (citing *Tolliver* with approval); *Miller v. Annucci*, No. 17-cv-4698, 2019 WL 4688539, at *11-12, 2019 U.S. Dist. LEXIS 165759, at *31-36 (S.D.N.Y. Sept. 26, 2019) (following *Tolliver* in ruling on a plaintiff's motion for leave to amend pursuant to Fed. R. 15(a)). However, the events giving rise to Plaintiff's Razor Grievance, and

20

thus Plaintiff's Eighth Amendment claim, did not occur "after the date of the pleading to be supplemented"; the Wende officials forced Plaintiff to accept a DOCCS-issued razor, and Plaintiff submitted his Razor Grievance to the IGRC, *before* the Original Complaint was filed on June 27, 2019. Therefore, the ordinary rule that "a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced" applies. *Shepherd v. Lempke*, No. 10-cv-1524, 2017 WL 1187859, at *3, 2017 U.S. Dist. LEXIS 48054, at *6-8 (N.D.N.Y. Mar. 30, 2017) (affirming magistrate judge's conclusion that "[w]hile some circuits . . . have permitted plaintiffs to litigate the causes of action that were newly included in an amended complaint and fully exhausted by the time the plaintiffs filed the amended complaint, the Second Circuit squarely addressed those facts in [*Neal v. Goord*, 267 F.3d 116 (2d Cir. 2001)] and concluded otherwise"). Because Plaintiff had not exhausted his administrative remedies with respect to his Eighth Amendment claim at the time he commenced this action, that claim must be dismissed on exhaustion grounds.

At the same time, given that Plaintiff now appears to have completed the three-step grievance process with respect to the Razor Grievance filed in June 2019, he need not wait until CORC issues a decision on his appeal before bringing his claim, at least to the extent his claim is based on the same facts that form the basis of the Razor Grievance. Until very recently, District Courts in this Circuit were divided as to whether, and when, "delay by the CORC in issuing a timely decision to a prisoner's grievance renders exhaustion unavailable" as defined by the Supreme Court and the Second Circuit. *Bowie v. Woodruff*, No. 18-cv-00266, 2019 WL 5445519, at *1, 2019 U.S. Dist. LEXIS 183609, at *3-4 (N.D.N.Y. Oct. 23, 2019) (collecting cases). However, the Second Circuit has now definitively resolved this question, holding unequivocally that:

> [B]ecause the DOCCS Inmate Grievance Procedure imposes a mandatory deadline for the CORC to respond, an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations. We decline to impose a "reasonableness" requirement found nowhere in the text, which would leave inmates—and courts—to blindly speculate how long one must wait before filing suit.

*Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020). Assuming CORC still has not issued a decision on Plaintiff's appeal (in which case Plaintiff's administrative remedies with respect to the Razor Grievance would now be exhausted in any event), CORC has now exceeded their mandatory 30-day deadline for doing so by well over a year. Under *Hayes*, this delay clearly renders the exhaustion process "unavailable" to Plaintiff.

Therefore, to the extent Plaintiff's claim is based on the same facts underlying the Razor Grievance, Plaintiff is free to reinstitute his claim in Court by filing a new and separate action. *See Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004) (noting that where a plaintiff fails to exhaust administrative remedies, and the defect can be cured, dismissal without prejudice is proper).

## IV.   MOTION TO DISMISS

### A.   Standard of Review

Defendants move to dismiss Plaintiff's ADA and Rehabilitation Act claims against Defendants DOCCS, OMH and CNYPC pursuant to Fed. R. Civ. P. 12(b)(6).[17] To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual

---

[17] Defendants also move to dismiss Plaintiff's ADA claims under Fed. R. Civ. P. 12(b)(1), on the grounds that the Eleventh Amendment deprives this Court of subject matter jurisdiction over that claim. The legal standards applicable to that defense are discussed in Section IV.C.2 *supra.*

allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As to Plaintiff's motion to amend his complaint, Defendants' position is that "the claims raised in [P]laintiff's proposed Second Amended Complaint should be dismissed for the reasons discussed in [their] motion [to dismiss] in the event that the court grants [P]laintiff's motion for leave to file a Second Amended Complaint." (Dkt. No. 39, at 2 n.1). As Defendants' only ground for opposing Plaintiff's motion to amend is that amendment is "futile" because the SAC fails to state a claim on which relief could be granted, (Dkt. No. 39-3, at 27), the Court will review the allegations set forth in the SAC for purposes of Defendants' motion, and will grant Plaintiff's motion to amend to the extent that his claims as alleged in the SAC survive dismissal.

### B.    Legal Standards for ADA and Rehabilitation Act Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." *Id.* § 12131(2). A public entity includes a state or local government

body or any instrumentality thereof. *Id.* § 12131(1). Similarly, section 504 of the Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" receiving federal financial support. 29 U.S.C. § 794(a).

Both the ADA and the Rehabilitation Act "prohibit discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004), *corrected*, 511 F.3d 238 (2d Cir. 2004). The ADA defines "discriminate" as, inter alia, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the provider of the service] can demonstrate that the accommodation would impose an undue hardship on" its operations. 42 U.S.C. § 12112(b)(5)(A). Similarly, the Rehabilitation Act provides that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate,* 469 U.S. 287, 301 (1985).

C.    **Discussion**

Defendants raise an Eleventh Amendment defense to Plaintiff's ADA claims for monetary damages, but do not raise a similar defense with respect to Plaintiff's Rehabilitation Act claims.[18] (Dkt. No 39-3, at 15-19). "[I]f Plaintiff fails to allege an actionable ADA violation

---

[18] Indeed, it is doubtful that Plaintiff's Rehabilitation Act claims would be barred by the Eleventh Amendment. "The Second Circuit, as well as all other intermediate federal courts, has held that Congress intended states' acceptance of federal funds to constitute waiver of their Eleventh Amendment immunity as to claims under the Rehabilitation Act," and Courts in this Circuit have thus concluded that "New York's continued acceptance of federal funds on behalf of

at the outset, then questions of sovereign immunity are irrelevant." *Colón v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 15-cv-7432, 2017 WL 4157372, at \*6, 2017 U.S. Dist. LEXIS 151035, at \*16 (S.D.N.Y. Sept. 15, 2017). Therefore, the Court will first determine whether the SAC states prima facie claims under the ADA and the Rehabilitation Act. If the Court finds that the SAC does state a prima facie ADA claim, the Court will then turn to the question of whether that claim is barred by the Eleventh Amendment.

### 1.    Prima Facie Case

"As the standards for actions under [Title II] of the ADA and the Rehabilitation Act are generally equivalent, [the Court analyzes] such claims together" for purposes of determining whether the SAC has stated a prima facie claim. *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015) (citing *Harris v. Mills*, 572 F.3d 66, 73-74 (2d Cir. 2009)). "To establish a prima facie violation under these acts, a plaintiff must demonstrate (1) that []he is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that []he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability." *Id.* (quoting *Powell*, 364 F.3d at 85) (internal quotation marks omitted). "Discrimination under the third prong can include 'failure to make a reasonable accommodation' for the inmate." *McFadden v. Noeth*, 827 F. App'x 20, 28 (2d Cir. 2020) (quoting *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003)).

---

[DOCCS] constitutes a waiver of sovereign immunity as to all of [a] plaintiff's Rehabilitation Act claims" arising from DOCCS' programs and services. *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 413-15 (S.D.N.Y. 2006). Under the same reasoning, New York's acceptance of federal funds on behalf of OMH and CNYPC waives its Eleventh Amendment defense to Plaintiff's Rehabilitation Act claims against those entities. (Dkt. No. 41-27, at ¶¶ 20-21 (alleging that both entities receive federal funding to support their programs and services)).

For purposes of the present motion, there is no dispute that the SAC sufficiently alleges that Plaintiff is a qualified individual with a disability, (Dkt. No. 41-27, at ¶¶ 5-9, 30-36), that DOCCS, OMH and CNYPC are all state agencies and are thus "public entities" for purposes of the ADA, (*id.* ¶¶ 19-21, 272), and that DOCCS, OMH and CNYPC all receive federal funding that subjects them to the Rehabilitation Act, (*id.* ¶¶ 19-21, 272). Defendants argue primarily that the allegations in the SAC are insufficiently detailed to support a finding that Defendants discriminated against Plaintiff by reason of his disability, for purposes of either statute. (Dkt. No. 39-3, at 17-19, 25-26; Dkt. No. 47, at 13-14).

### a.      Claims against DOCCS

The Court finds that the SAC sufficiently alleges a prima facie claim of discrimination against DOCCS under the ADA and the Rehabilitation Act. Plaintiff alleges that, for periods spanning months at a time in 2015, 2016 and 2018, he was effectively denied access to DOCCs' "Call Home" program because of DOCCs' failure to fix the broken TTY devices he needed to make phone calls despite repeated requests, DOCCs' arbitrary and improper revocations of his right to use these devices, and correctional officers' refusal to provide him with access to the devices at times when non-disabled prisoners were free to make phone calls. *See* Section II.B.2.a *supra* (detailing relevant factual allegations); *see, e.g., Bartshe v. Comm'r of Vermont Dep't of Corr.*, No. 18-cv-166, 2020 WL 4754971, at *3-4, 2020 U.S. Dist. LEXIS 147701, at *8-12 (D. Vt. July 17, 2020) (denying summary judgment to the defendants on a prisoner's ADA claim where factual issues existed regarding the plaintiff's access to TTY devices and the effectiveness of other reasonable accommodations designed to give him equal access to telecommunications); *Fowler v. Dep't of Corr.*, No. 18-cv-01635, 2019 WL 2176304, at *4, 2019 U.S. Dist. LEXIS 84307, at *9-10 (D. Conn. May 20, 2019) (finding that a prisoner's allegations that correctional

officers denied him sufficient TTY access stated an ADA claim for failure to reasonably
accommodate and survived sua sponte review).

Plaintiff also alleges that, from approximately November 2015 through the remainder of
his incarceration at Wende, he was barred from using ASL to communicate while in the mess
hall, while other non-disabled inmates were allowed to communicate in any language. *See*
Section II.B.2.b *supra* (detailing relevant factual allegations). Especially in light of the fact that
Plaintiff allegedly struggles to distinguish voices and words in crowded, noisy rooms even with
hearing aids, (Dkt. No. 41-27, at ¶ 33), it is plausible to infer that this effectively deprived him of
the basic right to communicate with other inmates that non-disabled inmates enjoy.

Plaintiff further alleges that, during specific periods in 2017 and 2018, he was denied
access to Wende's "resource room" for hearing-impaired inmates and thus deprived of T-Coils,
pocket talkers and other aids and devices necessary to accommodate Plaintiff's disability. *See*
Section II.B.2.c *supra* (detailing relevant factual allegations). From these allegations, it is
reasonable to infer that Plaintiff's inability to access the resource room at least temporarily
prevented him from obtaining equipment that he was entitled to, and that he needed, in order to
participate in Wende's programs and services on equal footing with non-disabled inmates.
Furthermore, while DOCCS employees argued to Plaintiff that they were unable to provide him
with full access to the resource room due to inadequate staffing, they allegedly were able to
ensure that a different class of disabled inmates—visually impaired inmates—had full access to
*their* resource room despite these staffing concerns, while failing to ensure that hearing-impaired
inmates like Plaintiff received their necessary accommodations. (Dkt. No. 41-27, at ¶ 172-73).

Plaintiff also alleges that, for six days in June 2019, he was not taken to sick call to
receive replacement batteries for his hearing aids despite repeated requests, and that in August

2019, he was again deprived of the ability to hear for over a month when Defendants confiscated his hearing aids, lost them, and failed to timely provide him with new ones. *See* Section II.B.2.d *supra* (detailing relevant factual allegations). Given Plaintiff's allegations that he cannot hear without the use of hearing aids, (Dkt. No. 41-27, at ¶¶ 31-33), these allegations suggest that Defendants' failure to timely ensure that he had working hearing aids deprived him, at least temporarily, of the accommodations he needed to be able to fully participate in Wende's programs and services. *See McFadden*, 827 F. App'x at 28 (finding that allegations regarding defendants' failure to provide the plaintiff with working hearing aids sufficiently stated a claim under the ADA by alleging that the plaintiff "was denied access to plausible accommodations . . . which would have mitigated [his] impairment and permitted him to meaningfully participate in normal programs and activities"); *Degrafinreid*, 417 F. Supp. 2d at 411-13 (finding allegations that correctional officers confiscated and destroyed the plaintiff's hearing aids, and then delayed replacing them for fourteen months, stated a claim under both the Eighth Amendment and the ADA).

Finally, Plaintiff alleges that, in September 2019, he was not provided with a pocket talker that he needed to participate in his mandatory Program Committee call-out, resulting in him being unable to select his own programming and being placed in a program by default. *See* Section II.B.2.e *supra.* He also alleges that he failed to receive other reasonable accommodations during this period. *Id.*

Collectively, these allegations meet Plaintiff's burden, at the pleading stage, to state a prima facie claim that he was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability," for purposes of both the ADA and the Rehabilitation

Act. *Dean*, 804 F.3d at 187 (quoting *Powell*, 364 F.3d at 85). The cases Defendants rely on do not compel a different conclusion. Each of the cases Defendants cite reflect instances where plaintiffs failed to allege that they were excluded from any prison program or activity or treated differently than other similarly situated inmates because of their disability, where their claims were based on inadequate medical treatment rather than disability-based discrimination, where they were granted accommodations that were different from the ones they requested but were nonetheless reasonable, or where the discrimination they faced was based on factors other than their disability.[19] By contrast, here, Plaintiff has alleged detailed facts suggesting that, at certain times, DOCCS failed to provide him with accommodations such as replacement hearing aid batteries, access to TTY devices, and access to other accommodations in the resource room that were necessary for him to fully participate in Wende's programs and services. Moreover, he has pointed to specific services, programs and benefits Wende offers to inmates that, at times, he was

---

[19] *See Kearney v. Adams*, No. 15-cv-824, 2018 WL 3121618, at *9-10, 2018 U.S. Dist. LEXIS 21706, *26-30 (N.D.N.Y. Feb. 8, 2018) (recommending that the plaintiff's ADA claim be dismissed at summary judgment stage where the plaintiff "fail[ed] to identify any programs or services that he was excluded from because of DOCCs'" failure to provide him with bilateral knee braces and crutches, where the denial of those accommodations was based on a doctor's medical determination that they were not medically necessary, and where DOCCS provided the plaintiff with reasonable accommodations such as a walker), *report and recommendation adopted* 2018 WL 1470579, 2018 U.S. Dist. LEXIS 49139 (N.D.NY. Mar. 26, 2018); *Hall v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 12-cv-0377, 2015 WL 901010, at *3-6, 2015 U.S. Dist. LEXIS 25749, *17-28 (N.D.N.Y. Mar. 3, 2015) (dismissing ADA and Rehabilitation Act claims alleging disparate treatment and failure to reasonably accommodate the plaintiff's mental illness, where the plaintiff's denial of access to programs and services was based largely on his conviction of disciplinary offenses, the complaint failed to allege that "non-mentally-ill inmates convicted of a disciplinary offense and serving a sentence in SHU" received access to those programs, and the complaint largely complained of the adequacy of his mental health treatment rather than discrimination); *Roberts v. City of New York,* No. 14-cv-5198, 2016 WL 4146135, at *9, 2016 U.S. Dist. LEXIS 101750, at *25 (S.D.N.Y. Aug. 2, 2016) (dismissing ADA and Rehabilitation Act claims where the plaintiff failed to allege that he "was excluded from participation in any program or activity, or otherwise treated differently, because of" his diabetes, and his claims sounded in medical malpractice rather than disability discrimination); *Rosado v. Herard*, No. 12-cv-8943, 2014 WL 1303513, at *4-6, 2014 U.S. Dist. LEXIS 40172, at *11-19 (S.D.N.Y. Mar. 25, 2014) (dismissing ADA and Rehabilitation Act claims where the plaintiff's allegations suggested that he was denied access to therapeutic group sessions because of his ethnicity, not because of his mental illness); *Canales v. New York City Health & Hosps. Corp.*, No. 12-cv-3305, 2014 WL 2217001, at *4-5, 2014 U.S. Dist. LEXIS 77037, at *11-13 (S.D.N.Y. May 12, 2014) (dismissing ADA and Rehabilitation Act claims where the complaint was "devoid of any allegation that defendants excluded plaintiff from or denied plaintiff the benefits of any services, programs, or activities because of his carpal tunnel syndrome," and instead merely "assert[ed] that his disability was not adequately treated").

prevented from accessing due to DOCCS' failure to accommodate his disability, including the "Call Home" program, the right to communicate with other inmates in the mess hall, and a programming committee call-out.

Defendants also rely on *Ashcroft v. Lee*, No. 17-cv-0398, 2017 WL 8895116, 2017 U.S. Dist. LEXIS 177235 (N.D.N.Y. Oct. 24, 2017), *report and recommendation adopted* 2018 WL 910569, 2018 U.S. Dist. LEXIS 24829 (N.D.N.Y. Feb. 15, 2018), to argue that Plaintiff's allegations that certain DOCCS employees retaliated against him for filing grievances "cannot form the basis for [P]laintiff's ADA claims against DOCCS, CNYPC, or OMH." (Dkt. No. 39-3, at 17-18, 26; Dkt. No. 47, at 10-11). In *Ashcroft*, the Court found, based on exhibits the plaintiff attached to the complaint, that many of his requests for reasonable accommodations for his vision impairment had been denied for valid, nondiscriminatory reasons, and that "[w]hile plaintiff [also] complain[ed] that some of the accommodations he was granted were, in practice, denied to him or otherwise inadequate," the complaint suggested that "the denial of accommodations was the result of retaliatory animus by certain prison officials because plaintiff filed requests for accommodation," and there were no allegations "plausibly suggesting a causal connection between plaintiff's disability and the denial of accommodations." *Ashcroft*, 2017 WL 8895116, at *4-5, 2017 U.S. Dist. LEXIS 177235, at *11-14. The Court disagrees that the *Ashcroft* court's conclusion applies to bar Plaintiff's claims here. Here, Plaintiff has pled specific and concrete facts allowing a reasonable inference that, due to the failure of DOCCS and its employees to consistently and properly give him access to reasonable accommodations for his hearing disability, he was unable to fully "participate in or benefit from" the "services, programs, or activities" offered by the Wende facility. *Dean*, 804 F.3d at 187 (quoting *Powell*, 364 F.3d at 85). This is all he need do to make out a prima facie case under the ADA and the Rehabilitation

Act. At least at this stage, the fact that certain actions by particular DOCCS employees may have been motivated in part by factors other than discriminatory animus toward Plaintiff's disability—such as a desire to retaliate against Plaintiff for filing grievances—does not defeat his prima facie case.[20]

For the foregoing reasons, the Court finds that the SAC's allegations sufficiently state a prima facie claim against DOCCS under the ADA and the Rehabilitation Act.

### b.    Claims against OMH and CNYPC

The SAC also states a prima facie claim against OMH and CNYPC under the ADA and the Rehabilitation Act. Plaintiff alleges that, during his hospitalization at CNYPC from October 2017 through January 2018, these Defendants failed to provide Plaintiff with a slate of reasonable accommodations he requested for his hearing disability. *See* Section II.B.3 *supra* (detailing relevant allegations). He further alleges that the only reasonable accommodation these Defendants provided him with was replacement batteries for his hearing aids, *id.*, which, by themselves, do not allow him to hear well enough to distinguish voices and words unless he is in a room with "perfect conditions," including small rooms without any ambient noise, (Dkt. No. 41-27, at ¶¶ 32-33). Because Defendants provided no accommodations other than hearing aids, Plaintiff alleges that he could not meaningfully participate in programs and services the Defendants offered to patients, including "Treatment Mall" activities and therapeutic programming exercises, and could not understand the videos shown during therapy sessions. *See* Section II.B.3 *supra* (detailing relevant allegations). At the pleading stage, where the Court

---

[20] Indeed, at least for an ADA claim such as Plaintiff's that is based on a failure to reasonably accommodate his disability, pleading that Defendants' actions were motivated by "discriminatory animus or ill will" is, if anything, a requirement for overcoming an Eleventh Amendment defense, *see* Section IV.C.2 *supra*, not a requirement for stating a prima facie claim. *Cf. Tillman v. Verizon New York, Inc.*, 118 F. Supp. 3d 515, 538 (E.D.N.Y. 2015) (observing, in the context of an employment discrimination claim under the ADA, that "[a] claim based on a failure to make reasonable accommodations does not require the Plaintiff to show a discriminatory animus").

accepts these facts as true and draws all reasonable inferences in Plaintiff's favor, these allegations sufficiently state a claim that, by rejecting Plaintiff's request for reasonable accommodations, Defendants denied Plaintiff the opportunity to participate in and benefit from the treatment programs they offered on the same footing as non-disabled patients.[21] Thus, the SAC's allegations sufficiently state a prima facie claim against OMH and CNYPC under the ADA and the Rehabilitation Act.[22]

### 2.    Eleventh Amendment Immunity

Having found that the SAC states a claim against DOCCS, OMH and CNYPC under the ADA, the Court turns to the question of whether Plaintiff's ADA claim against these Defendants, which seeks only monetary damages and not injunctive relief, is barred by the Eleventh Amendment. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Notwithstanding its plain language, the Supreme Court has long held that the Eleventh Amendment bars *all* federal court claims against states, including by the states' own citizens, absent their consent to such suit or an express statutory waiver of immunity. *See, e.g., Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984). State immunity extends not only to the states, but also to state agencies. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139,

---

[21] The Court rejects Defendants' argument that there are "no allegation[s] that the programming [Plaintiff was denied access to] was run by CNYPC," (Dkt. No. 47, at 14), as the Court must draw all reasonable inferences in Plaintiff's favor at this stage, and the SAC permits a reasonable inference that the programming Plaintiff was unable meaningfully participate in while hospitalized at CNYPC was CNYPC's own programming.

[22] The Court notes that the SAC alleges discriminatory actions primarily by CNYPC, (Dkt. No. 41-27, at ¶¶ 183-92), but also alleges that CNYPC is a facility that is entirely "run by" OMH, and that OMH is ultimately responsible for the mental health services and programming CNYPC provides to inmates incarcerated in DOCCS facilities, (*id.* ¶¶ 20-21). Defendants raise no argument that Plaintiff may not maintain a claim against OMH based on CNYPC's actions, and as such, the Court will allow Plaintiff's claim to proceed against both entities at this stage.

142-47 (1993); *McGinty v. New York,* 251 F.3d 84, 95 (2d Cir. 2001) ("The Eleventh

Amendment extends immunity not only to a state, but also to entities considered 'arms of the

state.'").

Plaintiff does not dispute that DOCCS, OMH and CNYPC are all considered state

agencies protected by the Eleventh Amendment. *See, e.g., Rother v. N.Y. State Dep't of Corr.

and Cmty. Supervision*, 970 F. Supp. 2d 78, 89-90 (N.D.N.Y. 2013) ("DOCCS and its facilities

are state agencies for purposes of the Eleventh Amendment."); *Phillips v. Dawes*, No. 16-cv-

0219, 2016 WL 11478218, at *4, 2016 U.S. Dist. LEXIS 92245, at *9-10 (N.D.N.Y. July 14,

2016) (taking judicial notice that CNYPC is a state instrumentality and finding that it is entitled

to Eleventh Amendment purposes absent waiver or abrogation), *report and recommendation

adopted* 2016 WL 5864784, 2016 U.S. Dist. LEXIS 139515 (N.D.N.Y. Oct. 7, 2016); *Dimps v.

N.Y. State Office of Mental Health*, 777 F. Supp. 2d 659, 661-62 (S.D.N.Y. 2011) (finding OMH

is a state agency for Eleventh Amendment purposes). Thus, the question as to whether the

Eleventh Amendment bars Plaintiff's damages claim under the ADA is applicable to all three

Defendants.

In *Garcia v. State Univ. of N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98 (2d Cir. 2001),

the Second Circuit addressed the question of whether Congress had validly abrogated state

sovereign immunity from claims for monetary damages under Title II of the ADA. The Court

held that "it is clear that the Congress fully intended to abrogate state sovereign immunity" from

such claims, but that this purported abrogation was not valid, as the enactment of Title II

exceeded Congress's authority under § 5 of the Fourteenth Amendment to enforce the

protections afforded by that amendment's Equal Protection Clause. *Id.* at 108-10. However, the

Court found that Title II could be rehabilitated by requiring "plaintiffs bringing such suits to

establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability." *Id.* at 111. Recognizing that "direct proof of [discriminatory animus or ill will] will often be lacking," the Court further held that to establish such animus, a plaintiff may rely on a burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05 (1973), or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252-58 (1989). *Id* at 112.

After the Second Circuit's decision in *Garcia*, the Supreme Court decided *Tennessee v. Lane*, 541 U.S. 509 (2004), in which it held that Congress's abrogation of sovereign immunity under Title II was valid in the specific context of cases challenging barriers to courtroom accessibility. *Id.* at 531. It reasoned that in enacting Title II, Congress sought to enforce not only the Equal Protection Clause (as recognized in *Garcia*), but also "a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review," including rights under the Fourteenth Amendment's Due Process Clause. *Id.* at 522-23. Put another way, the Supreme Court found that Title II was "not wholly premised on discrimination against the disabled that violates the Equal Protection Clause," arguably opening up the possibility of other avenues for Title II damages claims to clear the Eleventh Amendment hurdle besides the Equal Protection "discriminatory animus" test recognized in *Garcia. Bolmer v. Oliveira*, 594 F.3d 134, 147 (2d Cir. 2010).

Following *Lane*, the Supreme Court decided *United States v. Georgia,* 546 U.S. 151 (2006), in which it held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159. However, because it was unclear whether the petitioner's amended complaint might assert Title II claims not premised on Fourteenth

Amendment violations, and because the justices disagreed as to the scope of Congress's "prophylactic" authority to regulate conduct not itself barred by the Fourteenth Amendment, the Court remanded for the lower courts to determine, "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 158-59. "Thus, *Georgia* explicitly left open the question of whether Congress may validly abrogate sovereign immunity with respect to a particular class of misconduct that violates Title II but does not violate the Fourteenth Amendment." *Dean*, 804 F.3d at 194.

The Second Circuit has not fully resolved the question of whether, or to what extent, *Garcia* remains valid in light of *Georgia*. In *Bolmer v. Oliveira*, 594 F.3d 134 (2d Cir. 2010), the Second Circuit held that "*Garcia* only applies to Title II claims based on Equal Protection," that "*Garcia* is not applicable when Congress's abrogation is supported by its enforcement of the substantive due process right not to be involuntarily committed absent a danger to self or others," and that "under *Georgia* and *Lane,* Congress validly abrogated states' Eleventh Amendment immunity where the same conduct by the defendant violated both Title II and substantive due process." *Id.* at 145-49. However, *Bolmer* did not address the standards District Courts should use in evaluating whether the Eleventh Amendment bars Title II damages claims based on conduct that does *not* independently implicate constitutional rights. Later, in *Dean v. University at Buffalo School of Medicine and Biomedical Sciences*, 804 F.3d 178, 187 (2d Cir. 2015), the Court recognized that "[c]ontinued uncertainty as to the vitality of *Garcia* has led to a divergence in the approaches adopted by district courts in this Circuit in their assessment of Congress's

abrogation of sovereign immunity under Title II," but expressed "no position" as to the issue. *Id.* at 194-95.

In light of this "continued uncertainty," District Courts have taken varying approaches to the continuing validity of *Garcia*. When determining whether Congress has validly abrogated states' sovereign immunity over Title II claims that do not independently implicate a constitutional violation, some courts have continued to apply *Garcia*'s "discriminatory animus or ill will" requirement. *See, e.g.*, *Bobbit v. Marzan*, No. 16-cv-2042 & 18-cv-2465, 2020 WL 5633000, at *13, 2020 U.S. Dist. LEXIS 172422, at *39 (S.D.N.Y. Sept. 21, 2020) (stating that, when applying the third clause of the *Georgia* test, "[a]t a minimum, covered claims include those where the plaintiff makes 'a showing of discriminatory animus or ill will,' because in those cases discrimination in contravention of the ADA also threatens the rights protected by the Equal Protection Clause"); *Monroe v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 16-cv-2818, 2019 WL 4688665, at *10, 2019 U.S. Dist. LEXIS 164527, at *26-27 (S.D.N.Y. Sept. 25, 2019) ("Many courts in the Second Circuit have used the discriminatory animus or ill will test laid out in *Garcia* to inform its analysis of the third clause of the *Georgia* test . . ."). Others have applied the three-part test articulated in *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997) to determine whether, for the particular Title II violation alleged, there is a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *See, e.g.*, *Lenti v. Connecticut*, No. 20-cv-127, 2020 WL 4275600, at *7-10, 2020 U.S. Dist. LEXIS 131189, at *21-31 (D. Conn. July 24, 2020); *Goonewardena v. New York,* 475 F. Supp. 2d 310, 322-24 (S.D.N.Y. 2007).

Here, following this Court's finding on sua sponte review that Plaintiff's allegations did not rise to the level of a violation of the Fourteenth Amendment's Due Process or Equal

Protection Clauses, (Dkt. Nos. 4, 16), and Plaintiff's voluntary dismissal of his First Amendment claims against the individual Defendants involved in the alleged ADA and Rehabilitation Act violations, (Dkt. No. 44), Plaintiff does not allege or argue that the conduct forming the basis of his ADA claim independently violates any constitutional right.[23] Thus, Plaintiff's claims appear to fall into the third clause of the *Georgia* analysis, meaning that to determine whether the Eleventh Amendment bars Plaintiff's claims, the Court must choose among the approaches District Courts have taken to decide whether Congress's abrogation of sovereign immunity was valid in the context of the particular conduct giving rise to Plaintiff's claims.

The parties' briefing is not especially helpful in resolving this question. Defendants argue that the Court should apply the *Garcia* test, but do not address the conflicting case law on whether *Garcia* remains valid law after *Lane, Georgia* and the Second Circuit's subsequent decisions. (Dkt. No. 39-3, at 16-19; Dkt. No. 47, at 11-12). Furthermore, beyond their arguments that the SAC fails to state an ADA claim in the first place, which the Court has rejected, Defendants fail to meaningfully explain why Plaintiff's allegations would not survive an Eleventh Amendment challenge under the burden-shifting or motivating-factor frameworks *Garcia* endorses. (*Id.*). Finally, Defendants do not present any argument as to whether Plaintiff's claims could survive an Eleventh Amendment defense under any approach other than *Garcia*, such as the *City of Boerne* test applied by some courts. (*Id.*).

Plaintiff, for his part, argues in conclusory fashion that, even if the Court applies *Garcia*, his claims survive an Eleventh Amendment challenge based on such a burden-shifting or motivating-factor framework, but does not explain *why* applying one or both of these

---

[23] Plaintiff's only surviving constitutional claim—his Eighth Amendment deliberate medical indifference claim against Defendants Eckert and Levitt, which has been dismissed for failure to exhaust administrative remedies rather than on its merits—is based on facts wholly distinct from and unrelated to his ADA claims.

frameworks saves his claims.[24] (Dkt. No. 42, at 23-24). Plaintiff further suggests that *Georgia* abrogated *Garcia* entirely, and argues that under *Georgia*, the Court should reject Defendants' Eleventh Amendment challenge because "Defendants have not argued that 1) the State's conduct did not violate the ADA; 2) that there are no accompanying violations of other constitutional provisions; or (3) [sic] if there are no other constitutional violations, that Congress's purported abrogation is invalid." (*Id.* at 24-25). But Plaintiff nowhere explains what basis the Court could have to find that his ADA claims involve constitutional violations (and thus survive under the second clause of the *Georgia* test), given the dismissal of all his constitutional claims related to the alleged ADA violations. (*Id.*). Nor does he clearly explain, assuming his claims fall into the third clause of the *Georgia* test and *Garcia* is not applicable, what test the Court should use to determine whether the Eleventh Amendment bars his claims. (*Id.*). Finally, while Plaintiff refers to the *City of Boerne* analysis in a parenthetical, (*id.* at 25), he does not present any argument on how the *City of Boerne* test might apply to his claims.

In the absence of more complete briefing from the parties on these questions, the Court need not wade into these turbulent constitutional waters. In the Second Circuit, the state entity asserting an Eleventh Amendment defense "bears the burden of demonstrating that it is . . . entitled to dismissal of [the] lawsuit on the ground of Eleventh Amendment immunity." *Woods v. Rondout Valley Ctr. Sch. Dist. Bd. Of Educ.*, 466 F.3d 232, 239 (2d Cir. 2006); *see also Leitner v. Westchester Comty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) ("All Circuits to have considered the question, including our own, require the party asserting Eleventh Amendment immunity to bear the burden of demonstrating entitlement."). Thus, while both parties' arguments are

---

[24] Plaintiff's citation to *Wright v. N.Y. State Dep't of Corr. & Comty. Supervision*, 831 F. 3d 64, 76 (2d Cir. 2016) is inapposite. *Wright* did not involve the application of *Garcia*'s burden-shifting analysis in the context of an Eleventh Amendment challenge, but rather involved a *different* burden-shifting analysis applied in analyzing, at the summary judgment stage, whether a plaintiff received "reasonable accommodations."

deficient with respect to the Eleventh Amendment questions at play, Defendants ultimately bear the burden of demonstrating that Plaintiff's claim must be dismissed on Eleventh Amendment grounds, and for the reasons identified above, they have not done so. Therefore, their Eleventh Amendment defense fails at this stage of the proceedings. *See, e.g.*, *Bobbit v. Marzan*, No. 16-cv-2042, 2018 U.S. Dist. LEXIS 120180,[25] at *9-10 (S.D.N.Y. July 17, 2018) (denying motion to dismiss ADA claim based upon sovereign immunity where Defendants have "made no attempt" to "make a showing that Congress's abrogation of sovereign immunity with respect to specific conduct underlying Plaintiff's ADA claim is invalid"); *Saunders v. Ryan*, No. 17-cv-0765, 2018 WL 4275987, at *6, 2018 U.S. Dist. LEXIS 152412, at *15-17 (N.D.N.Y. Sept. 7, 2018) (denying motion to dismiss ADA claim based on sovereign immunity where "Defendants do not discuss the merits of the competing approaches employed by the various district courts" but "simply state that [a finding that the plaintiff's claims are barred by the Eleventh Amendment] 'may' be justified," and declining to "decide such a thorny question" "[w]ithout more substantive briefing on the issue").

The need to resolve the Eleventh Amendment issue at the pleading stage is lessened even further given that the Court has found that Plaintiff's Rehabilitation Act claims against all three Defendants survives a motion to dismiss:

> "Because sovereign immunity does not bar [P]laintiff's Rehabilitation Act claim, the [C]ourt has subject matter jurisdiction over this action regardless of [Defendants'] immunity from the ADA claim. Consequently, there is no risk of violating [Defendants'] 'right not to be haled into court' when it is immune from suit. Moreover, the remedies available to plaintiff under Title II of the ADA and the Rehabilitation Act are identical. Thus, as a practical matter, this case will proceed on the same course regardless of whether [Defendants] may later be found immune from [P]laintiff's ADA claim."

---

[25] No parallel Westlaw citation available

*Ross v. City Univ. of New York*, 211 F. Supp. 3d 518, 528 (E.D.N.Y. 2016) (citations omitted); *see also, e.g.*, *Watley v. Dep't of Children & Families*, No. 13-cv-1858, 2019 WL 7067043, at * 7 n.11, 2019 U.S. Dist. LEXIS 219851, at *16 n.11 (D. Conn. Dec. 23, 2019) ("Because I conclude that Connecticut waived its immunity under the [Rehabilitation Act], I do not need to resolve [the question of whether *Garcia* remains valid law for purposes of Defendants' Eleventh Amendment defense to the plaintiff's ADA claim] and therefore do not reach it.").

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's ADA claim against Defendants DOCCS, OMH and CNYPC on Eleventh Amendment grounds is denied.

### 3.    Defendants' Remaining Arguments

#### a.    Exhaustion of Remedies

Defendants assert that, "[a]s [P]laintiff does not make any allegations to support a plausible inference of having exhausting [*sic*] his administrative remedies with regard to his Rehabilitation Act claims, plaintiff's claims under the Rehabilitation Act must dismissed as a matter of law." (Dkt. No. 39-3, at 27). Defendants misconstrue the burden of proof on the exhaustion issue. As noted above, because "[f]ailure to exhaust administrative remedies is an affirmative defense," it is "not a pleading requirement." *Williams,* 829 F.3d at 122. Thus, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Id.* (quoting *Jones*, 549 U.S. at 216). Nonetheless, "a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Id.* Furthermore, "[i]f a prisoner chooses to plead facts regarding exhaustion, and those facts show that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim." *Zielinski v. Annucci*, No. 17-cv-1042, 2019 WL 2870337, at *14, 2019 U.S. Dist. LEXIS 46111, at *41 (N.D.N.Y. Mar. 19, 2019).

Here, Plaintiff pleads specific facts reflecting that, with respect to the majority of events forming the basis of his ADA and Rehabilitation Act claims against DOCCS, he fully exhausted his administrative remedies prior to filing suit by going through the three levels of DOCCS' internal appeal process and either receiving a decision from CORC or allowing CORC's 30-day period for issuing a decision to lapse, which renders exhaustion unavailable under *Hayes*. (Dkt. No. 41-27, at ¶¶ 49, 51, 61, 70, 82-84, 91-97, 108-14, 171-72). For other events alleged in the SAC, it is not "clear on the face of the complaint that [Plaintiff] did not satisfy the PLRA exhaustion requirement," since the facts as alleged do not render it facially impossible that Plaintiff could have proceeded through the three-step grievance process and received a final decision from CORC prior to filing the Original Complaint (for events occurring prior to the filing of the Original Complaint) or the FAC (for events occurring between the filing of the Original Complaint and the FAC). *Williams,* 829 F.3d at 122; (Dkt. No. 41-27, at ¶¶ 45-48, 53-55, 86-88, 120-26, 132-36, 137-70). In light of this, and in the absence of any argument from Defendants (with whom the burden to prove lack of exhaustion lies) as to why these claims should be dismissed on exhaustion grounds, the Court will not dismiss Plaintiff's ADA and Rehabilitation Act claims against DOCCS for failure to exhaust.[26]

As for Plaintiff's ADA and Rehabilitation Act claims against OMH and CNYPC, Plaintiff alleges that CNYPC and OMH are entities "separate and apart from DOCCS," and that "[CNYPC] policies and staff decisions cannot be grieved through DOCCS' Inmate Grievance Program." (Dkt. No. 41-27, at ¶ 190). Defendants have not responded to this contention, nor

---

[26] Because Defendants' motion with respect to Plaintiff's ADA and Rehabilitation Act claims is a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and no party has argued that this motion should be treated as one for summary judgment pursuant to Fed. R. Civ. P. 56(a), the Court limits itself to the face of the SAC for purposes of this analysis, and does not consider evidence outside the SAC, including exhibits submitted in connection with Defendants' separate motion for summary judgment on Plaintiff's Eighth Amendment claim. *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006); *Roth v. Jennings*, 489 F.3d 499, 409 (2d Cir. 2007).

have they otherwise argued that Plaintiff had any administrative remedies he needed to exhaust before filing his claims against these Defendants. Therefore, the Court will not dismiss Plaintiff's ADA and Rehabilitation Act claims against OMH and CNYPC for failure to exhaust.

### b.    Statute of Limitations

Defendants also state that "because plaintiff does not provide a time-line for the acts constituting the alleged ADA violations, it is unknown whether a statute of limitations defense exists," but do not actually seek dismissal of any claim on statute of limitations grounds. (Dkt. No. 39-3, at 19; Dkt. No. 47, at 12-13).[27] The SAC, however, sets forth specific dates for virtually every factual allegation forming the basis of Plaintiff's ADA and Rehabilitation Act claims, and in any event, because Defendants do not actually raise a statute of limitations defense, the Court need not consider this issue. *See Lyn v. Inc. Vill. of Hempstead*, No. 03-cv-5041, 2007 WL 1876502, at *16 n.13, 2007 U.S. Dist. LEXIS 46957, at *52-53 n.13 (E.D.N.Y. June 28, 2007) ("Issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived." (citations omitted)).

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion to amend his complaint (Dkt. No. 30) is **GRANTED**; and it is further

**ORDERED** that Plaintiff is directed to file an edited Second Amended Corrected Complaint, by December 21, 2020, correcting the spelling of the parties' names in the caption of

---

[27] Courts in this Circuit apply New York's three-year statute of limitations for personal injury actions to claims brought in New York under the ADA and Rehabilitation Act, *Stropkay v. Garden City Union Free Sch. Dist.*, 593 F. App'x 37, 41 (2d Cir. 2014) (collecting case law), and "the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process" required by the PLRA. *Gonzalez*, 651 F.3d at 323-24.

the complaint and correcting the spelling of Defendant Jacqueline Levitt's name in Dkt. No. 41-27, and that this complaint will be the operative pleading; and it is further

      **ORDERED** that Defendants' motion for summary judgment and dismissal of Plaintiff's claims (Dkt. No. 39) is **GRANTED** as to Plaintiff's Eighth Amendment claim against Defendants Eckert and Levitt; **DENIED** as to Plaintiff's ADA and Rehabilitation Act claims against Defendants DOCCS, OMH and CNYPC; and **DENIED AS MOOT** in all other respects; and it is further

      **ORDERED** that Plaintiff's Eighth Amendment claim against Defendants Eckert and Levitt is **DISMISSED without prejudice** for failure to exhaust administrative remedies.

      **IT IS SO ORDERED.**

Dated: December 13, 2020
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge