**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MATTHEW JOHN MATAGRANO,

                                        Plaintiff,                    9:19-cv-763 (BKS/DJS)

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION,
CENTRAL NEW YORK PSYCHIATRIC CENTER, and
NEW YORK STATE OFFICE OF MENTAL HEALTH,

                                        Defendants.

---

**Appearances:**

*For Plaintiff:*
Amy Jane Agnew
Joshua L. Morrison
Law Office of Amy Jane Agnew, P.C.
24 Fifth Avenue, Suite 1701
New York, NY 10011

*For Defendants:*
Letitia James
Attorney General of the State of New York
Adrienne J. Kerwin
Assistant Attorney General, of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        In this action, Plaintiff Matthew John Matagrano asserts claims pursuant to Title II of the

Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), and Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., against Defendants New York State

Department of Corrections and Community Supervision ("DOCCS"), Central New York

Psychiatric Center ("CNYPC"), and New York State Office of Mental Health ("OMH"), arising

out of Plaintiff's confinement at Wende Correctional Facility ("Wende") and CNYPC. (*See* Dkt.

No. 49 (second amended complaint)). Presently before the Court is Defendants' motion pursuant

to Federal Rule of Civil Procedure 56 for summary judgment as to all of Plaintiff's remaining

claims. (Dkt. Nos. 100, 110). Plaintiff opposes Defendants' motion and cross-moves for partial

summary judgment on his claim against OMH and CNYPC for failure to reasonably

accommodate him. (Dkt. No. 104). For the following reasons, Defendants' motion is granted in

part and Plaintiff's cross-motion is denied.

## II.     FACTS[1]

### A.      Plaintiff's Disability

Plaintiff, who entered Wende Correctional Facility in December 2013, suffers from

bilateral hearing loss. (Dkt. No. 100-23, ¶ 1; Dkt. No. 104-4, ¶ 1; Dkt. No. 100-14, at 28).

Because Plaintiff's mother was completely deaf, Plaintiff's first language was American Sign

Language ("ASL"). (Dkt. No. 111, ¶¶ 2–3; Dkt. No. 100-14, at 28). Plaintiff can also speak

English. (Dkt. No. 100-14, at 28, 102). Plaintiff asserts that he has always had poor hearing and

that his hearing has "steadily declined" throughout his life. (Dkt. No. 111, ¶ 5).

DOCCS has always housed Plaintiff in Sensorial Disabled Units or Programs when

Plaintiff was in a facility's general population. (*Id.* ¶ 6). Upon Plaintiff's incarceration in 2013,

---

[1] The facts are drawn from Defendants' Rule 56.1 statement, Plaintiff's response to Defendants' Rule 56.1 statement and statement of additional undisputed facts, Defendants' supplemental Rule 56.1 statement, and Defendants' response to Plaintiff's statement of additional undisputed facts, (Dkt. Nos. 100-23, 104-4, 110-6, 112-5), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. In considering the parties' cross-motions for summary judgment, the Court "in each case constru[es] the evidence in the light most favorable to the non-moving party." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621–22 (2d Cir. 2008).

DOCCS assessed his hearing impairment as "HL20," meaning he has significant hearing loss. (Dkt. No. 105-1, at 1; Dkt. No. 105-6).[2] Plaintiff has used assistive devices and other technology to address his hearing loss including hearing aids, TTY telephones, a shake awake alarm, a phone amplifier, a T-coil induction loop, and a pocket talker. (Dkt. No. 100-14, at 31–32, 38, 41–42; *see also* Dkt. No. 100-15 (Plaintiff's receipts for reasonable accommodations)). Plaintiff's use of a pocket talker had to be under DOCCS staff supervision. (Dkt. No. 100-20, ¶ 8).

### B.      ASL in the Wende Mess Hall

On or about November 20, 2015, Plaintiff and an inmate who is deaf, Bismark Lithgow, were speaking in ASL in the Wende mess hall. (Dkt. No. 111, ¶ 16; Dkt. No. 100-14, at 94–95). According to Plaintiff, a corrections officer became "very disrespectful and boisterous" and told Plaintiff and Mr. Lithgow that they had to cease communicating in ASL in the mess hall. (Dkt. No. 111, ¶ 17; Dkt. No. 100-14, at 95–96). A sergeant then told Plaintiff that he could not use sign language in the mess hall because he was "distracting [the] officers" and it "looks like gang signs." (Dkt. No. 100-14, at 96). Plaintiff filed a grievance complaining that the prohibition on using ASL in the mess hall was discriminatory because ASL was the only language prohibited. (*Id.* at 96–97; Dkt. No. 100-16, at 4). When DOCCS investigated the grievance, the staff denied harassing or discriminating against Plaintiff or "informing hearing impaired inmates that they could not use sign language in the messhall." (Dkt. No. 100-16, at 3).

Plaintiff testified at his deposition that, after the November 2015 incident, using sign language in the mess hall was "always a problem" because it distracted the staff and made them nervous. (Dkt. No. 100-14, at 97–98). Plaintiff testified that staff would "threaten" to issue misbehavior reports for signing in the mess hall but that he never received a misbehavior report.

---

[2] In July 2019, Plaintiff's hearing impairment was reassessed at "HL10," meaning deaf. (Dkt. Nos. 105-6, 105-19).

(*Id.* at 99). Plaintiff acknowledged at his deposition that he used ASL in the mess hall "maybe a week or so" after the November 20, 2015 incident. (*Id.*). But Plaintiff also asserts that there has been an "unofficial policy against using ASL in the mess hall ever since" November 2015 and that inmates will "attempt to sneak if no [corrections officer] is watching, but do not do so often." (Dkt. No. 111, ¶¶ 18, 24–26). According to Danyelle Hodges, Deputy Superintendent of Security at Wende, it is "not true" that ASL is banned in the Wende mess hall. (Dkt. No. 112-4, ¶¶ 1–2, 5). Unless "all talking in the mess hall is prohibited by staff for security reasons on a given day," any inmate "may communicate in any language, including ASL." (*Id.* ¶ 3).

### C.    Plaintiff's Stay at CNYPC

Plaintiff was transferred from Wende to CNYPC on October 5, 2017 for inpatient mental health treatment following a suicide attempt and was discharged back to Wende on January 31, 2018. (Dkt. No. 100-19, ¶ 8; Dkt. No. 100-1, ¶ 20). CNYPC "provides in-patient mental health treatment in a secure facility to incarcerated individuals in [DOCCS] custody." (Dkt. No. 100-1, ¶ 3). According to Christopher Boydston, who is employed by OMH at CNYPC as Inpatient Director, CNYPC "is not a correctional facility and does not provide programming like that provided in DOCCS." (*Id.* ¶ 4).[3] CNYPC's policy on "Reasonable Accommodations for Patients/Residents with Disabilities" set forth reasonable accommodation screening procedures

---

[3] Plaintiff moves to strike Boydston's declaration because Defendants did not disclose Boydston's name or identity in their Rule 26(a) disclosures. (Dkt. No. 104-4, ¶ 19). Rule 37 provides that a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e)" is "not allowed to use that information or witness to supply evidence on a motion . . . , unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In determining whether to exclude evidence under Rule 37(c)(1), courts must consider: (1) the party's explanation for the failure to comply with its disclosure obligations; (2) the importance of the evidence sought to be precluded; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new information; and (4) the possibility of a continuance. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006). Defendants have offered no explanation for their failure to name Boydston in their Rule 26 disclosure but assert that the purpose of Boydston's declaration is to "get the relevant documents before the Court and explain their relevance in the inpatient setting." (Dkt. No. 112, ¶ 4). Plaintiff has not indicated that any of the documents attached to the declaration was not produced to him during discovery. Under these circumstances, the Court will consider Boydston's declaration and the attached exhibits, as there is no indication that Plaintiff has suffered any prejudice as a result of Defendants' failure.

4

and provided that a patient who "feel[s] the need for a reasonable accommodation . . . should make a request in person or in writing through any member of the OMH staff." (Dkt. No. 100-3, at 4–6). The policy also listed certain assistive devices that "will be made available as needed and clinically indicated," including TTY, a telephone amplifier or T-coil, closed captioning, and sound amplification. (*Id.* at 7–8 (emphasis omitted)).

Plaintiff's treatment plan included "individual supportive counseling once per week and otherwise as needed to support Plaintiff with symptom management and discharge planning." (Dkt. No. 100-23, ¶ 21; Dkt. No. 104-4, ¶ 21). Plaintiff asserts that he was "very clear" in his original medical assessment that he "would need a T coil loop and/or pocket talker to hear programming" and that he also informed his therapist and psychiatrist that he needed a T-coil loop or pocket talker "multiple times." (Dkt. No. 111, ¶¶ 30–32).[4] Plaintiff was told that "they did not 'have one here.'" (*Id.* ¶ 31). Plaintiff also asserts that he asked to use a TTY multiple times "but was told it was on the other side of the building." (*Id.*; *see* Dkt. No. 100-14, at 59). According to Defendants, Plaintiff had the use of his hearing aids, a telephone amplifier, closed captioning, and preferred seating while at CNYPC. (*See* Dkt. No. 101-1, at 114 (psychological evaluation dated January 18, 2018 stating that Plaintiff "currently receives" these accommodations)). According to Plaintiff, however, CNYPC "did not have closed captioning on the vast majority of the movies and treatment videos" and preferred seating "can help in certain situations" but "does not cure [his] hearing disabilities." (Dkt. No. 111, ¶¶ 38–39).

---

[4] Defendants deny that Plaintiff indicated he needed a T-coil loop or pocket talker during his initial assessment with medical, because such a request would have been noted in his treatment record but was not. (Dkt. No. 112-3, ¶ 8 (declaration of Timothy Lamitie, CNYPC's Director of Facility Administrative Services, asserting that any requests for a T-coil loop or pocket talker or complaints about a lack of closed captioning "would have been noted in his treatment record")).

### 1.  Hearing Aid Batteries

At Plaintiff's October 18, 2017 individual counseling session, he told his therapist that he was "having a hard time hearing." (Dkt. No. 101-1, at 232 (therapist's progress note)). Plaintiff had received his hearing aids but the batteries were dead and the "nurse did not have the right size to replace them." (*Id.*). The therapist told Plaintiff "things he can do to help in the meantime such as sitting in the front of class so he can hear the facilitator, notify the staff he is hard of hearing[,] and ask them to speak up." (*Id.*). Plaintiff reported to his therapist that "at times the TV is on closed caption so he is able to watch tv that way." (*Id.*). The therapist's progress note included, as part of the follow-up plan, to "[f]ollow up with nursing regarding hearing aids." (*Id.* at 233). On October 25, 2017, Plaintiff reported that "he received his hearing aid and things are much better now that he has his hearing aids." (*Id.* at 240). On October 31, 2017, he reported to his therapist that "groups were going well and he [wa]s able to hear as well as able to hear in the dayroom." (*Id.* at 256).[5]

### 2.  Treatment Mall and Religious Services

Plaintiff testified at his deposition that CNYPC had a group room called the "Treatment Mall" which contained a "general library," school for young patients, video games, and movies. (Dkt. No. 100-14, at 60–63). Plaintiff also testified that Narcotics Anonymous and Alcoholics Anonymous meetings would take place in the Treatment Mall in the evening or late afternoon. (*Id.* at 63). Other than participating in treatment activities, (*see* Dkt. No. 100-2 (CNYPC records of Plaintiff's programming attendance)), Plaintiff spent "most of [his] time" watching movies,

---

[5] In a progress note dated January 4, 2018, a nurse recorded that Plaintiff reported that he broke the back part of his hearing aid which holds the batteries. (Dkt. No. 101-1, at 393). The nurse explained to Plaintiff that there were "no instances of [Plaintiff] having difficulty hearing with the one hearing aide," or with no hearing aids in the morning. (*Id.*). In response, Plaintiff laughed and stated "Yeah, don't worry about it" and that he could wait until he returned to Wende to fix it. (*Id.*).

(Dkt. No. 100-14, at 60). Plaintiff asserts that he "spoke with the staff many, many times about [his] need for closed captioning or even subtitles." (Dkt. No. 111, ¶ 38; *see also* Dkt. No. 100-14, at 68–69 (Plaintiff agreeing at his deposition that "sometimes" the movies had closed captioning and "sometimes they didn't")).

Plaintiff asserts that he also spent a lot of time in a "day room" which was "smaller than the Treatment Mall area," making it easier for Plaintiff to hear. (Dkt. No. 111, ¶ 37). Plaintiff also testified that he attended Catholic religious services in a room in the basement. (Dkt. No. 100-14, at 63–64). Plaintiff, who was raised Catholic, understood the prayers and "the process" but had trouble understanding the priest's homily. (*Id.*).

### 3.    Plaintiff's Letters and CNYPC's Response

In a letter dated November 30, 2017 which was ultimately marked received by "Risk Management" at CNYPC, Plaintiff wrote that he was "bilaterally hearing impaired" and that CNYPC "should have been notified of the sensorial disability as a matter of routine, as well as [his] medically approved reasonable accommodations" that he had at Wende. (Dkt. No. 100-4, at 2). Plaintiff complained that he could not hear on the "patient phone" even with his hearing aids and that he could not hear the "DVD instructional disc or many times the facilitator" during "therapeutic treatment mall." (*Id.* at 3). Plaintiff wrote that he had "expressed these concerns to [staff] and [his] assigned primary care providers." (*Id.*). Plaintiff requested that he be returned to DOCCS and opined that there was "currently no need for acute inpatient care." (*Id.* at 4).

In a note to the Director of Risk Management dated December 11, 2017, Plaintiff reported that he had sent to the hospital director a "written request for reasonable accommodation for [his] bilateral hearing impairment (CCTV, TTY/TDD, Preferred Seating)," but had not received a response. (Dkt. No. 100-5, at 2). Also in December, Plaintiff wrote a letter to the Director of Inpatient Risk Management and stated that he "need[ed] certain

accommodations/auxiliary aids so that [he] can function in program(s)." (Dkt. No. 100-6, at 3).
Plaintiff wrote that it was "difficult for [him] to hear during the treatment mall for a lot [of]
reasons." (*Id.*). Plaintiff again said that his "ultimate goal [wa]s to return to DOCCS custody
(ASAP)." (*Id.* at 2; *see also* Dkt. No. 100-7 (December 8, 2017 letter in which Plaintiff states
that he "require[s] specific reasonable accommodations in order to function in daily life")).

Risk Management reviewed Plaintiff's complaints and reached out to his treatment team.
(Dkt. No. 100-10 (memorandum dated December 20, 2017 summarizing results of investigation);
Dkt. No. 100-11 (email correspondence between a Risk Management Specialist and members of
Plaintiff's treatment team regarding his complaints); Dkt. No. 100-9 (memorandum dated
December 20, 2017 and addressed to Plaintiff responding to his concerns)). Plaintiff's primary
therapist noted that Plaintiff reported hearing difficulty "during the first week or two after his
admission" due to dead batteries for his hearing aids, but that Plaintiff reported he was "no
longer having any difficulty hearing while in groups" once he received new batteries. (Dkt. No.
100-10, at 2). The therapist reported that she had "provided several phone calls for [Plaintiff]
during which time he has not appeared to have any issues with hearing." (*Id.* at 2–3).[6] Plaintiff's
nurse prescriber similarly reported that "she had not been made aware of any difficulties with
hearing." (*Id.* at 3). Risk Management concluded that Plaintiff had not identified "any hearing
difficulties or concerns since his first week or so after being admitted" and that the concerns
"that he did identify during the first week were addressed immediately by providing . . . new
hearing aid batteries." (*Id.*).

---

[6] The therapist also reported that on one occasion Plaintiff "was sitting in the backroom with his eyes closed," a staff
member "called his name with normal tone and volume," and Plaintiff "immediately looked up and came over." (Dkt.
No. 100-11, at 9; *see also* Dkt. No. 101-1, at 383, 385).

### D.      Closure of the Wende "Resource Room"

The "Resource Room" for hearing impaired inmates at Wende was designed to provide inmates with sensorial disabilities "additional areas [to] take part in learning or activities for which special equipment was necessary." (Dkt. No. 100-20, ¶ 12). Plaintiff testified that the Resource Room has movies, sign language teaching aids, and computers. (Dkt. No. 100-14, at 49–51). The Resource Room was closed on June 25–29 and July 2–6, 2018 because of a staffing shortage. (Dkt. No. 100-20, ¶¶ 17–19; Dkt. No. 100-14, at 91 (Plaintiff testifying that the Resource Room was closed those dates because "no one was there to open")). According to Christopher Zaluski, an Offender Resource Coordinator at Wende, the closure of the Resource Room on these days "did not preclude Plaintiff from taking part in any activity available to the general population" and "[n]one of the assistive devices issued to, or needed by, Plaintiff for other programming w[as] locked in the Resource Room." (Dkt. No. 100-20, ¶¶ 21–22).

### E.      September 2019 Program Call-Out

Plaintiff alleges in the second amended complaint that he was unable to "attend his mandatory Program Committee call out to participate in the selection of his programming" on September 10, 2019 because he did not have his hearing aids at the time and was not provided with a pocket talker. (Dkt. No. 49, ¶¶ 132–35). According to Zaluski, Wende records indicate that Plaintiff was scheduled for a call out on September 10, 2019 because Plaintiff "needed a program assignment." (Dkt. No. 110-5, ¶ 9). Plaintiff "did come to that call out" and was placed in Alcohol and Substance Abuse Treatment ("ASAT") programming, which was on his list of "required programming." (*Id.* ¶¶ 9–10). Plaintiff "refused to participate in ASAT." (*Id.* ¶ 11).

Plaintiff did not file or appeal a grievance alleging that he was not provided a pocket talker for use in a September 2019 call out meeting or that he was denied the ability to participate

in the selection of his programming. (Dkt. Nos. 110-1, 110-2, 110-4 (lists of grievances filed by Plaintiff)).

## III.     STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences

against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

Still, the nonmoving party "must do more than simply show that there is some metaphysical

doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts

to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d

Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a

genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159,

166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

Following prior motion practice and stipulations of voluntary discontinuance,[7] Plaintiff

asserts claims under the ADA and Rehabilitation Act against Defendants premised on (1) the

alleged ban on the use of ASL in the Wende mess hall, (2) the failure to reasonably

accommodate Plaintiff at CNYPC, (3) the closure of the Wende Resource Room in June and July

2018, and (4) the failure to accommodate Plaintiff with a pocket talker for a September 2019

program call-out at Wende. Defendants move for summary judgment as to all of Plaintiff's

remaining claims. (Dkt. Nos. 100, 110).[8] Plaintiff opposes Defendants' motion and cross-moves

for partial summary judgment as to Plaintiff's claim that OMH and CNYPC failed to reasonably

accommodate him while he was at CNYPC. (Dkt. No. 104).

---

[7] *See, e.g.*, *Matagrano v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 19-cv-763, 2020 WL 7338586, 2020 U.S. Dist. LEXIS 234149 (N.D.N.Y. Dec. 14, 2020); (Dkt. Nos. 43, 99 (stipulations of voluntary dismissal)).

[8] Defendants' motion for summary judgment did not address the alleged failure to reasonably accommodate Plaintiff with a pocket talker in September 2019. (*See generally* Dkt. No. 100-24; *see also* Dkt. No. 100-13, ¶¶ 3–7 (defense counsel declaration setting forth her efforts to confirm the remaining claims with Plaintiff's counsel prior to moving for summary judgment)). Defendants requested and received permission to supplement their motion for summary judgment to address the pocket talker claim. (Dkt. Nos. 106, 109; *see* Dkt. No. 110 (Defendants' supplement in support of motion for summary judgment)).

### A.      Legal Standards for ADA and Rehabilitation Act Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132. A qualified individual with a disability is defined as "an individual

with a disability who, with or without reasonable modifications to rules, policies, or practices,

. . . meets the essential eligibility requirements for . . . participation in programs or activities

provided by a public entity." *Id.* § 12131(2). The term "public entity" includes a state or local

government body or any instrumentality thereof. *Id.* § 12131(1). Similarly, Section 504 of the

Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity"

receiving federal financial support. 29 U.S.C. § 794(a).

"As the standards for actions under [Title II] of the ADA and the Rehabilitation Act are

generally equivalent, [the Court] analyze[s] such claims together." *Dean v. Univ. at Buffalo Sch.*

*of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015) (citing *Harris v. Mills*, 572 F.3d

66, 73–74 (2d Cir. 2009)). To establish a prima facie violation under the ADA and Rehabilitation

Act, a plaintiff must demonstrate "(1) that []he is a 'qualified individual' with a disability; (2)

that the defendants are subject to one of the Acts; and (3) that []he was 'denied the opportunity to

participate in or benefit from defendants' services, programs, or activities, or was otherwise

discriminated against by defendants, by reason of h[is] disability.'" *Id.* (citation omitted).

"Discrimination under the third prong can include 'failure to make a reasonable accommodation'

for the inmate." *McFadden v. Noeth*, 827 F. App'x 20, 28 (2d Cir. 2020) (summary order)

(citation omitted); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004) (noting

that both the ADA and the Rehabilitation Act "prohibit discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations"), *corrected*, 511 F.3d 238 (2d Cir. 2004).

### B.    Availability of Damages Under the ADA and Rehabilitation Act

Defendants argue that they are entitled to summary judgment on Plaintiff's ADA and Rehabilitation Act claims because compensatory damages, the only relief Plaintiff seeks, are unavailable. (Dkt. No. 100-24, at 11).[9] Plaintiff responds that only emotional distress damages are unavailable under the Rehabilitation Act and that he may recover nominal damages. (Dkt. No. 104-5, at 21–22).

In *Cummings v. Premier Rehab Keller, P.L.L.C.*, the Supreme Court held that "emotional distress damages are not recoverable" under the Rehabilitation Act and the Affordable Care Act, the two "Spending Clause antidiscrimination statutes" under consideration in that case. 142 S. Ct. 1562, 1576 (2022). The Court reasoned that "Spending Clause legislation operates based on consent" and therefore that the "scope of available remedies" depends on whether a prospective funding recipient would have been aware that it might face such liability. *Id.* at 1570–71. Because it is "hornbook law that 'emotional distress is generally not compensable in contract,'" the Court could not "treat federal funding recipients as having consented to be subject to damages for emotional distress," and such damages therefore are not recoverable under the Rehabilitation Act and Affordable Care Act. *Id.* at 1571–72 (citation omitted). Since *Cummings*, district courts in this Circuit have held that emotional distress damages are likewise not recoverable under Title II of the ADA, which expressly incorporates the remedies of the

---

[9] It is undisputed that Plaintiff does not seek any injunctive relief. (Dkt. No. 100-23, ¶ 3; Dkt. No. 104-4, ¶ 3).

Rehabilitation Act, even though the ADA was not enacted pursuant to the Spending Clause. 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [section 505 of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of [42 U.S.C. § 12132]."); *see, e.g.*, *Doherty v. Bice*, No. 18-cv-10898, 2023 WL 5103900, at *6, 2023 U.S. Dist. LEXIS 139187, at *16–17 (S.D.N.Y. Aug. 9, 2023) ("[A]ll other federal courts that have apparently considered this issue have likewise found that emotional distress damages are not available under the ADA because, as the *Cummings* Court concluded, they are not available under the Rehabilitation Act." (collecting cases)); *Williams v. Colo. Dep't of Corr.*, No. 21-cv-2595, 2023 WL 3585210, at *5–6 & n.5, 2023 U.S. Dist. LEXIS 89153, at *15–16 & n.5 (D. Colo. May 22, 2023) (collecting cases).

Accordingly, the Court holds that Plaintiff may not recover emotional distress damages on his Rehabilitation Act and ADA claims.[10] Plaintiff nonetheless argues that dismissal of his remaining claims is not warranted because "[o]ther damages are available to Plaintiff—in particular, nominal damages." (Dkt. No. 104-5, at 21–22). Defendants have not addressed the availability of nominal damages under the Rehabilitation Act or the ADA, other than suggesting that such damages were not sought in the second amended complaint or Plaintiff's Rule 26 initial disclosures. (Dkt. No. 112-6, at 3). However, Plaintiff's prayer for relief seeks compensatory damages and "such other relief as the court may deem just and proper," (Dkt. No. 49, at 35), and his failure to specifically request nominal damages in the complaint is not determinative, *see Fantasia v. Montefiore New Rochelle*, No. 19-cv-11054, 2022 WL 20540940, at *5, 2022 U.S.

---

[10] Plaintiff does not appear to dispute that emotional distress damages are unrecoverable under the Rehabilitation Act and Title II of the ADA. Although Plaintiff notes that *Cummings* "did not hold that *all* compensatory damages are unavailable under the Rehabilitation Act," (Dkt. No. 104-5, at 21 (emphasis added)), he does not identify any compensatory damages he seeks to recover which are not for emotional distress.

Dist. LEXIS 107935, at *11 (S.D.N.Y. June 16, 2022) (noting that a plaintiff "may seek nominal damages at trial even if she did not explicitly request nominal damages in her complaint" (citations omitted)). At least some district courts have concluded that nominal damages are available under the Rehabilitation Act and ADA even though emotional distress damages are not recoverable. *See id.*, 2022 WL 20540940, at *5, 2022 U.S. Dist. LEXIS 107935, at *11–12 (concluding that nominal damages are available under the Rehabilitation Act because "nominal damages are a generally accepted remedy in contract actions"); *Vega-Ruiz v. Northwell Health Sys.*, No. 19-cv-537, 2023 WL 2587508, at *3, 2023 U.S. Dist. LEXIS 47769, at *7–8 (E.D.N.Y. Mar. 20, 2023) (finding that the plaintiff "still has a claim for nominal damages" under the Rehabilitation Act); *but see K.G. v. Woodford Cnty. Bd. of Educ.*, No. 18-cv-555, 2022 WL 17993127, at *3–4, 2022 U.S. Dist. LEXIS 233069, at *8–9 (E.D. Ky. Dec. 29, 2022) (discussing a lack of uniformity on the issue); *Hacker v. Dart*, 62 F.4th 1073, 1087 (7th Cir. 2023) (noting that a claim for nominal damages "can present some challenging legal issues, including whether Congress authorized them under the ADA or the Rehabilitation Act").

Thus, because it is not clear that there is no relief to which Plaintiff may be entitled should he prevail on his Rehabilitation Act and ADA claims, the Court denies Defendants' motion for summary judgment on this basis.

### C.  Vicarious Liability Under the ADA and Rehabilitation Act

Defendants next argue that they are entitled to summary judgment because neither Title II of the ADA nor the Rehabilitation Act provides for vicarious liability of public entities. (Dkt. No. 100-24, at 12–14). Plaintiff responds that entities may be held liable for damages under the ADA and Rehabilitation Act under the "appropriate official theory" set forth in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). (Dkt. No. 104-5, at 22–24).

As Defendants point out, a number of Circuit Courts of Appeals have held that Title II of the ADA and the Rehabilitation Act do not allow for recovery based an entity's vicarious liability for the acts of its employees. *See, e.g.*, *Jones v. City of Detroit*, 20 F.4th 1117, 1119, 1121 (6th Cir. 2021) (noting that the remedies available for violations of Title II of the ADA and the Rehabilitation Act are "coextensive" with those for Title VI, and holding that because "Title VI does not allow vicarious liability, neither do these provisions of the ADA or the Rehabilitation Act"); *Ingram v. Kubik*, 30 F.4th 1241, 1256–59 (11th Cir. 2022) (holding that vicarious liability is unavailable under Title II of the ADA). Neither the Supreme Court nor the Second Circuit has expressly addressed whether vicarious liability is available under Title II and the Rehabilitation Act. *See City & County of San Francisco v. Sheehan*, 575 U.S. 600, 610 (2015) (declining to decide whether a public entity "can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees"). The Court need not decide whether Defendants can be held vicariously liable because, as Plaintiff points out, *Gebser* and Second Circuit caselaw provide for a different theory of liability which directly holds an entity responsible and is distinct from vicarious liability.

In *Gebser*, the Supreme Court held that Title IX[11] does not "permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official." 524 U.S. at 285. Instead, the Supreme Court held that, "in cases . . . that do not involve official policy of the recipient entity," "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute

---

[11] Title IX "was modeled after Title VI," and the two statutes operate in the same manner. *Gebser*, 524 U.S. at 286. As do Title II and the Rehabilitation Act, Title IX "incorporates the remedies established by Title VI." *Jones*, 20 F.4th at 1120.

corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* at 290. Further, the "response must amount to deliberate indifference to discrimination." *Id.* Although Defendants suggest that *Gebser* is incompatible with other cases holding vicarious liability is not available under Title II and the Rehabilitation Act, the test set forth in *Gebser* does not represent a species of vicarious liability, but rather a manner of holding the entity itself directly liable based on actual notice of and a deliberately indifferent response to discrimination. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664–65 (2d Cir. 2012) ("In certain circumstances, courts view actions of a third party as intentional violations by the funding recipient itself." (citing, inter alia, *Gebser*)). Indeed, *Gebser* itself held that a damages award under Title IX could not be premised on a theory of vicarious liability. 524 U.S. at 285. Thus, even assuming Defendants are correct that Plaintiff may not prevail on his claims on a theory of vicarious liability, that does not end the inquiry.

The Second Circuit has held that "monetary damages are recoverable only upon a showing of an *intentional* violation" of the Rehabilitation Act. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009). An intentional violation is shown by "deliberate indifference to the strong likelihood [of] a violation" and does not require "personal animosity or ill will." *Id.* (citation omitted). Intentional discrimination "may be inferred when a 'policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom." *Id.* (citation, brackets, and ellipses omitted). The standard for deliberate indifference in this context is borrowed from *Gebser*: damages are not recoverable unless

> an official who at a minimum [1] has authority to address the alleged
> discrimination and to institute corrective measures on the recipient's

> behalf [2] has actual knowledge of discrimination in the recipient's
> programs and [3] fails adequately to respond.

*Biondo v. Kaledia Health*, 935 F.3d 68, 73–74 (2d Cir. 2019) (quoting *Loeffler*, 582 F.3d at 276).

Such deliberate indifference "must reflect a 'deliberate choice among various alternatives' and

may not be inferred from mere 'negligence or bureaucratic inaction.'" *Id.* (quoting *Loeffler*, 582

F.3d at 276).

Here, Plaintiff argues in conclusory fashion that "Defendants' employees were, in fact,

appropriate officials" whose failure to adequately respond satisfies the deliberate indifference

standard. (Dkt. No. 104-5, at 23–24). Defendants reply that "Plaintiff can point to no evidence

that any 'official capacity defendant' (of which there are none in this case) had actual notice of

alleged discrimination . . . , had the authority to ameliorate it[,] and took no action." (Dkt. No.

112-6, at 3–4).[12] In the absence of more detailed briefing, the Court cannot assess any arguments

about the evidence for deliberate indifference in this case.

Moreover, assuming nominal damages are both the only remedy Plaintiff seeks and

recoverable under the ADA and Rehabilitation Act, *see supra* Section IV.B, the parties have not

addressed what showing Plaintiff is required to make to recover nominal damages. In other

words, the parties have not addressed whether Plaintiff could recover nominal damages by

proving only a technical violation of the statutes, or rather whether he is required to prove an

intentional violation as he would be to recover compensatory damages. *See Berry-Mayes v.*

*N.Y.C. Health & Hosps. Corp.*, 712 F. App'x 111, 112 n.1 (2d Cir. 2018) (summary order)

(holding that argument about nominal damages was forfeited and therefore considering only

whether the plaintiff "sufficiently demonstrated the deliberate indifference necessary for

---

[12] Defendants cite no authority for the proposition that an "official capacity defendant" must be named.

compensatory damages" in case involving the ADA and Rehabilitation Act); *Hejmej v. Peconic Bay Med. Ctr.*, No. 17-cv-782, 2023 WL 4373628, at *2–3, 2023 U.S. Dist. LEXIS 116145, at *5–6 (E.D.N.Y. July 6, 2023) (deferring decision on whether the plaintiffs "are required to show Defendants' deliberate indifference in order to recover nominal damages under the Rehabilitation Act"); *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 379 (5th Cir. 2021) (noting that the plaintiff-appellant "ha[d] made no attempt to argue that his nominal-damages claims, if any exist, are not subject to the same intentional-discrimination standard as a claim for compensatory monetary damages"); *Lockwood v. Our Lady of the Lake Hosp., Inc.*, 467 F. Supp. 3d 435, 438 (M.D. La. 2020) (finding that the plaintiffs "could recover nominal damages if they proved intentional discrimination on the part of the defendant"); *Nix v. Advanced Urology Inst. of Ga., PC*, No. 21-10106, 2021 WL 3626763, at *3, 2021 U.S. App. LEXIS 24467, at *7–8 (11th Cir. Aug. 17, 2021) (rejecting the plaintiff's argument that she was entitled to a jury trial on nominal damages "even in the absence of intentional discrimination" and suggesting that intentional discrimination was a "necessary element of [the plaintiff's] civil rights claim" which she could not prove).

In sum, the Court concludes that Defendants' argument about vicarious liability does not warrant summary judgment on any claim.

### D.     Use of ASL in the Wende Mess Hall

Defendants move for summary judgment on Plaintiff's ADA and Rehabilitation Act claims relating to the use of ASL in the Wende mess hall. (Dkt. No. 100-24, at 9–11, 15–16).

### 1.     Timeliness

Defendants first argue that Plaintiff's claim based on his being directed not to use ASL in the Wende mess hall is untimely. (*Id.* at 9–11). The parties appear to agree that Plaintiff fully exhausted his grievance relating to the November 2015 ASL incident on February 3, 2016, and

that the three-year statute of limitations period therefore expired on February 3, 2019—before Plaintiff commenced this lawsuit on June 27, 2019. (*See id.*). Defendants argue that the continuing violation doctrine "does not operate to save Plaintiff's untimely claim" because Plaintiff testified at his deposition that he was able to use ASL in the Wende mess hall within a week of the November 2015 incident and he can therefore "pinpoint" the exact days the alleged violation occurred and ended. (*Id.* at 10). Plaintiff responds that the continuing violation doctrine applies to Plaintiff's claim because Plaintiff asserts that the "ban on hand gestures . . . continues to this day." (Dkt. No. 104-5, at 16–17).

Although Plaintiff did testify at his deposition that he used ASL in the mess hall approximately one week after the November 2015 incident, (Dkt. No. 100-14, at 99), that was not the entirety of his testimony. He also testified that using sign language in the mess hall was "always a problem" after the incident and that staff would threaten misbehavior reports. (*Id.* at 98–99). Plaintiff also asserted in his declaration that there has been an "unofficial policy against using ASL in the mess hall ever since" November 2015 and that inmates will "attempt to sneak" signing if no officer is watching. (Dkt. No. 111, ¶¶ 18, 24–26). Thus, construing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether the alleged prohibition on the use of ASL in the Wende mess hall continued throughout Plaintiff's stay at Wende such that the continuing violation doctrine might apply and render the claim timely. Defendants therefore have not met their burden at this stage of demonstrating that Plaintiff's claim is untimely.

### 2.    Exhaustion and Pleadings

Defendants argue that Plaintiff's claim related to an ongoing ban on ASL in the Wende mess hall should be dismissed because Plaintiff did not grieve such a claim pursuant to the DOCCS Incarcerated Grievance Program or plead such a claim in the second amended

complaint. (Dkt. No. 112-6, at 6–8). Defendants raised these arguments in their reply brief, in response to Plaintiff's argument that the ban on ASL in the Wende mess hall "continues to this day." (Dkt. No. 104-5, at 16). While "[a]rguments made for the first time in a reply brief need not be considered by a court," *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (citation omitted), the Court has considered these arguments in order to make a full record.

Defendants argue that the only grievance Plaintiff filed related to the use of ASL in the Wende mess hall was after the isolated incident in November 2015 and that such grievance "did not complain about an ongoing ASL 'ban.'" (Dkt. No. 112-6, at 7 & n.3; *see* Dkt. No. 100-16 (grievance packet for grievance WDE-41583-15)). The grievance packet from November 2015 submitted to the Court contains Plaintiff's "Appeal Statement" in which he states that the "prohibition o[n] using ASL in the messhall when hearing inmates [are] allowed to verbally communicate is discrimination," (Dkt. No. 100-16, at 4), but does not contain a copy of the original grievance itself. Accordingly, without knowing the contents of Plaintiff's grievance, the Court could not find that Defendants have met their burden of demonstrating their entitlement to summary judgment on Plaintiff's ASL claim for failure to exhaust his administrative remedies.

Defendants also argue that "nothing in the [second amended complaint] alleges an 'ASL ban' in the Wende mess hall" and that any "evidence offered relating to an alleged 'ASL ban' should be disregarded." (Dkt. No. 112-6, at 6–7). However, Plaintiff alleged that "DOCCS allows non-hearing impaired/deaf inmates to communicate in the mess hall in any language" while Plaintiff "and his deaf counterparts were not allowed to use ASL in the mess hall." (Dkt. No. 49, ¶ 50). Plaintiff specifically alleges that the "violation was on-going . . . as at no time were [Plaintiff] and his hearing-impaired and deaf cohort allowed to communicate with ASL in the mess hall of Wende without risk of receiving a disciplinary ticket." (*Id.* ¶ 52). The Court

therefore rejects Defendants' argument that Plaintiff did not plead an ongoing prohibition on the use of ASL in the Wende mess hall.

### 3. Disparate Impact

Defendants argue that they are entitled to summary judgment on Plaintiff's ADA and Rehabilitation Act claims relating to being told to stop using ASL in the Wende mess hall because (1) there is no evidence that Plaintiff's "primary way of communicating is through ASL" and therefore Plaintiff cannot establish that he was directed to stop using ASL in the mess hall "because of his disability," and (2) any attempt by DOCCS employees to prevent the use of ASL in the mess hall was "motivated by security efforts to prevent gang communication" and not by discrimination. (Dkt. No. 100-24, at 15–16). Plaintiff responds that this claim relies on a disparate impact theory and Defendants are not entitled to summary judgment. (Dkt. No. 104-5, at 15–16).

To establish a prima facie case of discrimination under Title II of the ADA or the Rehabilitation Act under a disparate impact theory, a plaintiff "must demonstrate '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'" *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (citation omitted). At the summary judgment stage, "plaintiffs are ordinarily required to include statistical evidence to show disparity in outcome between groups." *Id.* (citation omitted). Although the plaintiff "need not show discriminatory intent under this theory, it must prove that the practice 'actually or predictably results in discrimination,'" and there must be a "causal connection between the policy at issue and the discriminatory effect." *Quad Enters. Co., LLC v.*

*Town of Southold*, 369 F. App'x 202, 206 (2d Cir. 2010) (summary order) (citation and ellipses omitted).[13]

Here, there is an issue of fact as to whether the use of ASL was banned in the Wende mess hall between November 20, 2015 and Plaintiff's transfer to Sullivan Correctional Facility in January 2020.[14] Plaintiff argues that it "can be inferred that the unwritten policy was against hand gestures in the mess hall" and that this ban "had a disparate impact on ASL speakers." (Dkt. No. 104-5, at 15). The Court agrees that there is evidence such that a disparate impact claim, which Defendants did not squarely address, survives summary judgment. Assuming there was a policy that hand signals, or ASL in particular, could not be used in the Wende mess hall, a jury could reasonably conclude that such a policy has a "significantly adverse or disproportionate impact" on inmates who are deaf or hard of hearing—including Plaintiff—by restricting their ability to communicate with other inmates. *B.C.*, 837 F.3d at 158; *see Forsyth v. Univ. of Ala., Bd. of Trs.*, No. 20-12513, 2021 WL 4075728, at *6, 2021 U.S. App. LEXIS 26945, at *19 (11th Cir. Sept. 8, 2021) (noting that "it may not be necessary to provide statistical data" when assessing disparate impact claims related to disability").

Accordingly, the Court concludes that there is record evidence with which Plaintiff could prove a technical violation of the ADA and Rehabilitation Act.[15]

---

[13] Because a plaintiff need not show discriminatory intent to prevail on a disparate impact claim, Defendants' argument that Plaintiff's claim fails because there is no evidence that he was directed to stop using ASL "because of his disability" is misplaced. (*See* Dkt. No. 100-24, at 16). Defendants also argue that Plaintiff "cannot establish that any direction not to use ASL in the mess hall [prevented] Plaintiff from participating in DOCCS benefits and services." (Dkt. No. 112-6, at 8). But Title II of the ADA and the Rehabilitation Act also prohibit a qualified individual from being "subjected to discrimination." 42 U.S.C. § 12132; 29 U.S.C. § 794(a).

[14] Plaintiff has not asserted or argued that any such ban was pursuant to a formal or written DOCCS policy. (*See* Dkt. No. 111, ¶ 18 (asserting that there has been an "unofficial policy against using ASL in the mess hall")).

[15] As discussed above, the Court does not find Defendants' argument about vicarious liability determinative. And the parties have not sufficiently addressed the deliberate indifference standard set forth in *Gebser*, *Loeffler*, and *Biondo* to permit meaningful analysis.

### E.     Accommodations at CNYPC

Defendants argue that Plaintiff cannot establish a violation of the ADA or Rehabilitation Act because he cannot prove that CNYPC or OMH "denied him benefits or services at CNYPC . . . because of his disability." (Dkt. No. 100-24, at 20–22). Defendants also argue that CNYPC and OMH "had no knowledge that Plaintiff experienced hearing issues that actually prohibited him from taking part in any benefit or service at CNYPC" and therefore that Plaintiff cannot establish that any accommodation was denied "because of his disability." (*Id.*). Plaintiff argues that he is entitled to summary judgment on this claim because he requested facially reasonable accommodations at CNYPC, which were denied without a reasonable accommodation "screening" or "individualized inquiry" into their reasonableness. (Dkt. No. 104-5, at 17–20).

In examining a claim premised on a theory of failure to reasonably accommodate, the Court asks "whether a plaintiff with disabilities 'as a practical matter' was denied 'meaningful access' to services, programs or activities to which he or she was 'legally entitled.'" *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003)). A reasonable accommodation "need not be 'perfect' or the one 'most strongly preferred'" by the plaintiff, but it must be "effective." *Id.* (quoting *Dean*, 804 F.3d at 189). "Determining the reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder." *Id.* at 72–73 (citation, brackets, and internal quotation marks omitted).

#### 1.     Reasonableness of CNYPC's Accommodations

To accommodate Plaintiff's hearing impairment at CNYPC, Plaintiff had the use of hearing aids, a telephone amplifier, closed captioning, and preferred seating. (Dkt. No. 101-1, at 114). Plaintiff does not dispute that he received these accommodations, although he asserts that most of the "movies and treatment videos" did not have closed captioning and that preferred

seating helps only in certain situations. (Dkt. No. 111, ¶¶ 38–39). Defendants argue that these accommodations were reasonable because "it was determined that Plaintiff's hearing impairment was not, in fact, prohibiting Plaintiff from effectively and meaningfully participating" in CNYPC's services. (Dkt. No. 112-6, at 15).

The Court concludes that there is an issue of fact regarding whether Plaintiff, as a practical matter, was denied "meaningful access" to services, programs, and activities to which he was legally entitled while at CNYPC. *Wright*, 831 F.3d at 72. According to Defendants, Plaintiff expressed no concerns about his inability to hear other than one issue with his hearing aid batteries which was promptly resolved. *See supra* Section II.C. However, Plaintiff asserts that there was not closed captioning "on the vast majority of the movies and *treatment videos*." (Dkt. No. 111, ¶ 38 (emphasis added)). And in letters written in November and December 2017, Plaintiff complained that he could not hear the "DVD instructional disc or many times the facilitator" during "therapeutic treatment mall." (Dkt. No. 100-4, at 3). This issue of fact precludes a determination as a matter of law regarding whether Plaintiff was denied meaningful access to treatment programs and other services at CNYPC, and Defendants' motion for summary judgment cannot be granted on this basis. *Cf. Wright*, 831 F.3d at 73 ("On this record, we cannot determine that DOCCS's accommodations are plainly reasonable and effectively provide Wright meaningful access . . . because there is evidence that indicates that the mobility assistance program . . . discourages his participation in prison activities."). The possibility that a reasonable factfinder could conclude that Plaintiff was *not* denied meaningful access to CNYPC's services and programs also precludes summary judgment in Plaintiff's favor on this claim. *Lane v. Carpinello*, No. 07-cv-751, 2009 WL 3074344, at *17, 2009 U.S. Dist. LEXIS 88345, at *57–58 (N.D.N.Y. Aug. 31, 2009) (finding questions of fact precluding summary

judgment where the plaintiff asserted he was "unable to participate in recreation" and "read" without his requested accommodations and the defendants contended that the plaintiff "demonstrated no signs of difficulty" and "was able to fully participate in his treatment groups"), *report and recommendation adopted by* 2009 WL 3074344, 2009 U.S. Dist. LEXIS 88341 (N.D.N.Y. Sept. 24, 2009).

### 2. Reasonableness of Requested Accommodations

Even though the reasonableness of the accommodations Plaintiff actually received at CNYPC cannot be determined as a matter of law at this time, the Court may also consider whether, under a burden-shifting framework, Plaintiff's "proposed accommodation would have been reasonable." *Wright*, 831 F.3d at 76. Under this burden-shifting framework, the plaintiff "bears the initial burden of both production and persuasion as to the existence of an accommodation that is facially reasonable." *Id.* (quotation marks and brackets omitted). The burden of persuasion "then shifts to the defendant to 'rebut the reasonableness of the proposed accommodation,'" which is "in essence equivalent" to showing that the proposed accommodation would cause the defendant "to suffer an undue hardship." *Id.* (citation omitted). An "individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances." *Id.* at 77 (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001)).

Here, Plaintiff asserts that he requested a T-coil loop, pocket talker, and more closed captioning while at CNYPC.[16] Were a factfinder to credit this evidence, it seems likely that Plaintiff can meet the "light burden of production" as to the "facial reasonableness" of the

---

[16] Plaintiff also asserts that he requested access to a TTY phone at CNYPC, but the parties stipulated to the voluntary discontinuance of all claims "derived from Plaintiff's access to a TTY machine" at both Wende and CNYPC. (Dkt. No. 99).

proposed accommodations. *Cf. id.* at 76.[17] Defendants offer no argument that any of these requested accommodations would impose an undue hardship, instead focusing their arguments on whether Plaintiff in fact needed any additional accommodations. Thus, Defendants are not entitled to summary judgment on the ground that Plaintiff's proposed accommodations would not have been reasonable.

In sum, in light of the numerous disputed issues of fact, no party is entitled to summary judgment on Plaintiff's Title II and Rehabilitation Act claims that he was not reasonably accommodated at CNYPC.

### F.       Closure of the Wende "Resource Room"

Defendants move for summary judgment on Plaintiff's ADA and Rehabilitation Act claims against DOCCS for the denial of access to the Wende Resource Room on June 25–29 and July 2–6, 2018. (Dkt. No. 100-24, at 17–20). Plaintiff's opposition indicates that he "asked Defendants to stipulate to a voluntary dismissal of the Resource Room claims and await[ed] response." (Dkt. No. 104-5, at 7 n.1). In reply, Defendants state that Plaintiff failed to address Defendants' argument regarding this claim and "has offered to discontinue it," and that, as a result, "Defendants are entitled to summary judgment on that claim." (Dkt. No. 112-6, at 2 n.1). The parties have not filed a stipulation of voluntary discontinuance of this claim.

The Second Circuit has held that "a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Jackson v. Fed. Express*, 766 F.3d 189,

---

[17] The Court rejects Plaintiff's suggestion that the accommodations he received at DOCCS facilities are necessarily reasonable under the circumstances at CNYPC without any further inquiry. Further, although Plaintiff argues that Defendants did not strictly follow CNYPC's policies and procedures regarding reasonable accommodations, he provides no authority to support the proposition that the failure to follow the letter of a policy necessarily amounts to a violation of Title II of the ADA or the Rehabilitation Act.

195 (2d Cir. 2014); *see id.* at 196 (drawing a distinction between fully unopposed and partially opposed motions for summary judgment in counseled cases). This is because "[g]enerally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others." *Id.* at 196. Here, the Court need not infer abandonment of Plaintiff's Resource Room claim because Plaintiff abandoned the claim affirmatively and explicitly. Plaintiff's opposition and cross-motion for partial summary judgment noted that Plaintiff had sought Defendants' consent to a voluntary discontinuance of the claim but did not otherwise address the claim in any way. (Dkt. No. 104-5, at 7 n.1). Plaintiff's memorandum of law did not respond to Defendants' argument in support of summary judgment on the claim. (*See generally* Dkt. No. 104-5). Further, rather than substantively responding to the portion of Defendants' statement of facts relevant to this claim, Plaintiff simply asserted "No longer relevant to the litigation." (*See* Dkt. No. 104-4, ¶¶ 8–11, 16–17). Thus, because Plaintiff has abandoned the claim relating to the closure of the Wende Resource Room in June and July 2018, the claim is dismissed with prejudice. *See LaFever v. Clarke*, 525 F. Supp. 3d 305, 333 (N.D.N.Y. 2021) (dismissing claims that were abandoned on summary judgment); *Leavitt v. Ethicon, Inc.*, 524 F. Supp. 3d 360, 367 (D. Vt. 2021) (granting motion for summary judgment in light of the plaintiffs' "unequivocal abandonment of certain claims").

### G.    September 2019 Program Call-Out

Defendants argue that they are entitled to summary judgment on Plaintiff's claim relating to the alleged failure to provide him with a pocket talker in September 2019 for use in a programming meeting because, inter alia, Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 110-7, at 3–8). Plaintiff did not respond to this argument.

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined

in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 442 (S.D.N.Y. 2004) ("The ADA falls within the rubric of 'any other federal law.'"). Proper exhaustion of administrative remedies depends on the rules and regulations of the prison in which the grievance is filed; that is, an inmate of a DOCCS facility must satisfy the requirements set forth by DOCCS regulations to properly exhaust administrative remedies. *See Garcia v. Heath*, 74 F.4th 44, 46 (2d Cir. 2023); *see also Hayes v. Dahlke*, 976 F.3d 259, 268 (2d Cir. 2020) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007))).

Defendants "bear the initial burden of establishing the affirmative defense of non-exhaustion 'by pointing to "legally sufficient sources" such as statutes, regulations, or grievance procedures' which demonstrate that 'a grievance process exists and applies to the underlying dispute.'" *Williams v. Correction Officer Priatno*, 829 F.3d 118, 126 n.6 (2d Cir. 2016) (quoting *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015)). "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors . . . rendered a nominally available procedure unavailable as a matter of fact." *Hubbs*, 788 F.3d at 59 (citing *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, 578 U.S. 632, 639–42 (2016)).

Under DOCCS regulations, an inmate must generally submit a grievance within twenty-one days of an alleged occurrence, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a)(1), but may request an extension within forty-five days of the alleged occurrence, *see id.* § 701.6(g)(1)(i)(a). An inmate's grievance "should contain a concise, specific description of the problem and the action requested." *Id.* § 701.5(a)(2). Subsequent procedural exhaustion of a filed grievance then involves three steps: (1) the grievance is reviewed and resolved by the Inmate Grievance Resolution Committee ("IGRC"), *id.* § 701.5(b); (2) the grievant appeals an adverse decision of the IGRC to the superintendent of the facility at which the grievance was filed, *id.* § 701.5(c); and (3) the grievant appeals an adverse decision of the superintendent to the Central Office Review Committee ("CORC"), *id.* § 701.5(d). Upon the rendering of CORC's decision, or if CORC fails to respond to a grievance within thirty days of its appeal under the third step of the process, the grievant has exhausted administrative remedies. *See Hayes*, 976 F.3d at 269–70.

Here, Defendants have established that the grievance procedures contemplated by DOCCS regulations applied to inmates at Wende and Sullivan Correctional Facility, to which Plaintiff was transferred in January 2020. (Dkt. No. 110, ¶¶ 1, 11–12 (declaration of Incarcerated Grievance Program Director Rachael Seguin asserting that Wende and Sullivan both had "fully functioning incarcerated grievance processes available"); *see id.* ¶¶ 8–9 (asserting that Plaintiff's claim regarding the pocket talker "is the proper subject for a grievance under DOCCS grievance procedures")). Plaintiff did not file a grievance about the pocket talker in September 2019, (Dkt. Nos. 110-1, 110-2, 110-4), and Plaintiff has offered no evidence or advanced any argument that the grievance process was unavailable to him.

Thus, because Plaintiff did not file any grievance concerning the alleged failure to be provided with a pocket talker in September 2019, he failed to exhaust his available

administrative remedies and Defendants' motion for summary judgment as to this claim is granted.

### H.     Eleventh Amendment Sovereign Immunity

Finally, Defendants argue that they are "immune to suit for money damages in connection with Plaintiff's ADA Title II claim[s]." (Dkt. No. 100-24, at 22–28); *see Cuomo v. N.Y. State Assembly Judiciary Comm.*, No. 22-mc-3027, 2023 WL 4686957, at *16–17, 2023 U.S. Dist. LEXIS 126153, at *46–47 (E.D.N.Y. July 21, 2023) (rejecting the argument that state sovereign immunity "must be addressed as a threshold matter" because it is not "fundamentally preliminary" or an "absolute stricture" on courts).[18]

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Notwithstanding its plain language, the Supreme Court has long held that the Eleventh Amendment bars *all* federal court claims against states, including by the states' own citizens, absent their consent to such suit or an express statutory abrogation of immunity. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100 (1984). State immunity extends not only to the states, but also to state agencies. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 142–47 (1993); *McGinty v. New York*, 251 F.3d 84, 95 (2d Cir. 2001) ("The Eleventh Amendment extends immunity not only to a state, but also to entities considered 'arms of the

---

[18] Defendants do not raise an Eleventh Amendment defense with respect to Plaintiff's Rehabilitation Act claims and, as the Court noted in its prior decision, it is "doubtful" that Plaintiff's Rehabilitation Act claims would be barred by the Eleventh Amendment. *Matagrano*, 2020 WL 7338586, at *11 n.18, 2020 U.S. Dist. LEXIS 234149, at *35 n.18. Courts in this Circuit have concluded that "New York's continued acceptance of federal funds" under the Rehabilitation Act "constitutes a knowing waiver of sovereign immunity." *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 331–32 (E.D.N.Y. 2014) (collecting cases).

state.'"). Here, it is undisputed that each Defendant is considered a state agency protected by the Eleventh Amendment. *See Matagrano*, 2020 WL 7338586, at *15, 2020 U.S. Dist. LEXIS 234149, at *46–47.

In *Garcia v. State University of N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98 (2d Cir. 2001), the Second Circuit addressed the question of whether Congress had validly abrogated state sovereign immunity from claims for monetary damages under Title II of the ADA. The Court held that "it is clear that the Congress fully intended to abrogate state sovereign immunity" from such claims, but that this purported abrogation was not valid because the enactment of Title II exceeded Congress's authority under Section 5 of the Fourteenth Amendment to enforce the protections afforded by that amendment's Equal Protection Clause. *Id.* at 108–10. However, the Court found that Title II could be rehabilitated by requiring "plaintiffs bringing such suits to establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability." *Id.* at 111. Recognizing that "direct proof of [discriminatory animus or ill will] will often be lacking," the Court further held that to establish such animus, a plaintiff may rely on a burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252–58 (1989). *Id* at 112.

After *Garcia*, the Supreme Court decided *Tennessee v. Lane*, 541 U.S. 509 (2004), holding that Congress's abrogation of sovereign immunity under Title II was valid in the specific context of cases challenging barriers to courtroom accessibility. *Id.* at 531. It reasoned that in enacting Title II, Congress sought to enforce not only the Equal Protection Clause (as recognized in *Garcia*) but also "a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review," including rights under the Fourteenth Amendment's

Due Process Clause. *Id.* at 522–23. Put another way, the Supreme Court found that Title II was "not wholly premised on discrimination against the disabled that violates the Equal Protection Clause," arguably opening up the possibility of other avenues for Title II damages claims to clear the Eleventh Amendment hurdle besides the Equal Protection "discriminatory animus" test recognized in *Garcia*. *Bolmer v. Oliveira*, 594 F.3d 134, 147 (2d Cir. 2010).

Following *Lane*, the Supreme Court decided *United States v. Georgia*, 546 U.S. 151 (2006), in which it held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159. However, because it was unclear whether the petitioner's amended complaint might assert Title II claims not premised on Fourteenth Amendment violations, and because the justices disagreed as to the scope of Congress's "prophylactic" authority to regulate conduct not itself barred by the Fourteenth Amendment, the Court remanded for the lower courts to determine, "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 158–59. "Thus, *Georgia* explicitly left open the question of whether Congress may validly abrogate sovereign immunity with respect to a particular class of misconduct that violates Title II but does not violate the Fourteenth Amendment." *Dean*, 804 F.3d at 194.

The Second Circuit has not fully resolved the question of whether, or to what extent, *Garcia* remains valid in light of *Georgia*. In *Bolmer*, the Second Circuit held that "*Garcia* only applies to Title II claims based on Equal Protection," that "*Garcia* is not applicable when

Congress's abrogation is supported by its enforcement of the substantive due process right not to be involuntarily committed absent a danger to self or others," and that "under *Georgia* and *Lane*, Congress validly abrogated states' Eleventh Amendment immunity where the same conduct by the defendant violated both Title II and substantive due process." 594 F.3d at 145–49. However, *Bolmer* did not address the standard for evaluating whether the Eleventh Amendment bars Title II damages claims based on conduct that does *not* independently implicate constitutional rights. Later, in *Dean*, the Second Circuit recognized that "[c]ontinued uncertainty as to the vitality of *Garcia* has led to a divergence in the approaches adopted by district courts in this Circuit in their assessment of Congress's abrogation of sovereign immunity under Title II," but expressed "no position" as to the issue. 804 F.3d at 194–95.

In light of this "continued uncertainty," district courts have taken varying approaches to the continuing validity of *Garcia*. When determining whether Congress has validly abrogated states' sovereign immunity from Title II claims that do not independently implicate a constitutional violation, some courts have continued to apply *Garcia*'s "discriminatory animus or ill will" requirement. *See, e.g.*, *Bobbit v. Marzan*, No. 16-cv-2042, 2020 WL 5663000, at *13, 2020 U.S. Dist. LEXIS 172422, at *39 (S.D.N.Y. Sept. 21, 2020) (stating that, when applying the third clause of the *Georgia* test, "[a]t a minimum, covered claims include those where the plaintiff makes 'a showing of discriminatory animus or ill will,' because in those cases discrimination in contravention of the ADA also threatens the rights protected by the Equal Protection Clause"); *Monroe v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 16-cv-2818, 2019 WL 4688665, at *10, 2019 U.S. Dist. LEXIS 164527, at *26–27 (S.D.N.Y. Sept. 25, 2019) ("Many courts in the Second Circuit have used the discriminatory animus or ill will test laid out in *Garcia* to inform its analysis of the third clause of the *Georgia* test . . . ."). Others have

34

applied the three-part test articulated in *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), to determine whether, for the particular Title II violation alleged, there is a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *See, e.g.*, *Lenti v. Connecticut*, No. 20-cv-127, 2020 WL 4275600, at *7–10, 2020 U.S. Dist. LEXIS 131189, at *21–31 (D. Conn. July 24, 2020); *Goonewardena v. New York,* 475 F. Supp. 2d 310, 322–24 (S.D.N.Y. 2007).

Here, Defendants argue they are immune from Plaintiff's ADA claims for money damages under either *Garcia*'s "discriminatory animus or ill will" test or the *City of Boerne* "congruence and proportionality" test. (Dkt. No. 100-24, at 25–28). Plaintiff responds that, "[i]f *Garcia* is controlling, Plaintiff is entitled to damages for the failure to reasonably accommodate him with his pocket talker in 2019" because internal emails indicate that two employees "enjoyed making fun of" Plaintiff. (Dkt. No. 104-5, at 24–25).[19] Given the uncertainty described above, the Court will apply both tests.

The Court first concludes that Congress's purported abrogation of sovereign immunity as to Plaintiff's claims relating to the ASL ban in the Wende mess hall and the failure to reasonably accommodate Plaintiff at CNYPC is not valid under the test set forth in *Garcia*. Plaintiff has pointed to no evidence which would tend to establish that any of the conduct underlying those claims "was motivated by discriminatory animus or ill will based on [his] disability." *Garcia*, 280 F.3d at 111. Plaintiff himself suggests that the prohibition on using ASL in the mess hall was due not to any animus or ill will but because the guards could not distinguish ASL from gang signs and would get distracted or nervous. (Dkt. No. 100-14, at 97–98). And there is evidence

---

[19] Plaintiff makes no argument that any of the alleged Title II violations also independently violates the Constitution. Because the Court grants summary judgment to Defendants on Plaintiff's claim relating to the failure to accommodate with a pocket talker in September 2019 for failure to exhaust his available administrative remedies, Plaintiff's argument about the unprofessional internal emails is not relevant to the sovereign immunity analysis.

that the staff at CNYPC provided Plaintiff with certain accommodations and responded to his hearing aid battery issues and later to his written complaints. *See supra* Section II.C. Thus, abrogation is not proper under *Garcia*. *Cf. Kearney v. N.Y.S. D.O.C.S.*, No. 11-cv-1281, 2013 WL 5437372, at *10, 2013 U.S. Dist. LEXIS 140932, at *27 (N.D.N.Y. July 31, 2013) (concluding "the numerous accommodations granted to Plaintiff in lieu of the requested transfer weigh against a finding of discriminatory animus"), *report-recommendation adopted by* 2013 WL 5437372, 2013 U.S. Dist. LEXIS 139060 (N.D.N.Y. Sept. 27, 2013).

Under the *Georgia* framework, the Court must consider whether Congress's purported abrogation of sovereign immunity regarding the alleged conduct which may violate Title II but does not violate the Fourteenth Amendment is nevertheless valid. *Georgia*, 546 U.S. at 159. To do so, the Court applies the three-part test from *City of Boerne*. The first step is "to identify with some precision the scope of the constitutional right at issue." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001). The second consideration is "whether Congress identified a history and pattern of unconstitutional . . . discrimination by the States against the disabled." *Id.* at 368. At the final step, the Court considers whether the rights and remedies created by the ADA against the States are "congruent and proportional to the targeted violation." *Id.* at 372–74.

The parties have not expressly addressed the first step but appear to suggest that the constitutional right at issue is the right to equal protection of the laws under the Fourteenth Amendment. *See Chase v. Baskerville*, 508 F. Supp. 2d 492, 499–500 (E.D. Va. 2007) (concluding that, in the prison context, Title II "clearly implicates . . . the equal protection rights of the Fourteenth Amendment"). With respect to the second step, "several courts have interpreted *Tennessee v. Lane*, 541 U.S. 509 (2004), as 'conclusively establishing that Title II as a whole survives the historical inquiry under the second step of the *City of Boerne* test.'" *Lenti*,

2020 WL 4275600, at *10, 2020 U.S. Dist. LEXIS 131189, at *27–28 (collecting cases). Nevertheless, the Court agrees with those courts who have found that state prisoners' claims fail the third step of the *City of Boerne* test because, in the prison context, "Title II is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.*, 2020 WL 4275600, at *10, 2020 U.S. Dist. LEXIS 131189, at *29–30 (noting that courts have emphasized Title II's "broad scope" and the need for federal courts to be "cautious before interfering with the administration of a State's prison system") (citations omitted). Here, because there is no indication that Defendants acted irrationally or arbitrarily, or were motivated by discriminatory animus or ill will, the conduct alleged by Plaintiff is "far afield from the essence" of the Equal Protection Clause. *Id.*; *see also Chase*, 508 F. Supp. 2d at 504 ("In short, Title II imposes an affirmative accommodation obligation in the administration of state prisons that far exceeds what the Equal Protection Clause requires.").

Accordingly, the Court concludes that Plaintiff's ADA claims for money damages are barred by the Eleventh Amendment.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants New York State Department of Corrections and Community Supervision, Central New York Psychiatric Center, and New York State Office of Mental Health's motion for summary judgment (Dkt. No. 100) is **GRANTED in part**; and it is further

**ORDERED** that Plaintiff's claims under Title II of the ADA and the Rehabilitation Act based on (1) the closure of the Wende Resource Room in June and July 2018 and (2) the failure to accommodate with a pocket talker in September 2019 are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's claims under Title II of the ADA based on (1) the prohibition on the use of ASL in the Wende mess hall and (2) the failure to accommodate at CNYPC are **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 100) is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiff Matthew John Matagrano's cross-motion for partial summary judgment (Dkt. No. 104) is **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>September 12, 2023</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge